COMMONWEALTH *vs.* STEVEN A. COSTA.

Bristol. February 2, 1993. - March 15, 1993.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law,* Waiver of constitutional rights. *Malice. Intoxication. Intent. Practice, Criminal,* Instructions to jury, Argument by prosecutor, Deliberation of jury. *Jury and Jurors.*

At the hearing on a motion to suppress a criminal defendant's statements made during questioning by police, the evidence warranted the judge's finding that the defendant did not invoke his right to terminate the interrogation. [625-627]

Where a jury returned a verdict of guilty of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty, after receiving correct instructions on the effects of voluntary intoxiction as to those theories of first degree murder, no prejudice to the defendant resulted from the judge's erroneously precluding the jury from considering voluntary intoxication with reference to the "third prong" of malice, that is, a finding of malice by inference from the defendant's commission of an act that a reasonably prudent person would know is likely to result in death of another. [627-628]

At a murder trial, the prosecutor's closing argument did not exceed the bounds of propriety and presented no substantial risk of a miscarriage of justice. [628-629]

At a murder trial, it was appropriate for the judge to question the jurors collectively, rather than individually, as to whether an ostensibly misdirected telephone call received by the foreman would affect their ability to reach an impartial verdict, where the subject of the judge's inquiry raised no "serious question of possible prejudice." [629-630]

INDICTMENTS found and returned in the Superior Court Department on October 8, 1987.

A pretrial motion to suppress evidence was heard by *Elizabeth J. Dolan*, J., and the cases were tried before her.

*Donald A. Harwood* for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On Friday, October 2, 1987, at approximately 7:00 A.M., Steven Combs brought his dogs into the Freetown State Forest for a run. While running the dogs, Steven Combs found the body of a person who had been shot. Combs notified a Freetown State Forest ranger of the discovery. The ranger communicated with the Freetown police department, whose officers discovered the body of a white male lying face up on Ledge Road, a dirt travel way. The victim was wearing gray and white jeans, a red tee-shirt, and a maroon sweatshirt. A blanket was draped over the victim's shoulders. Officers observed gunshot wounds to the victim's head, groin, and chest. There were several abrasions on the victim's skin. The blanket, the victim's clothing, and the right side of his face, including his beard, had been burned. A book of matches and a cigarette butt were found near the victim's body.

Responding officers testified that they observed several footprints — shoe impressions — around the body, and tire tread impressions at the scene. It appeared that a vehicle had driven right up to the area where the body was discovered. From the tire tracks, the officers discerned that when the vehicle left the area, it backed away from the spot where they found the body, turned to the right, drove around the body, and proceeded down Ledge Road. The left rear tire of the vehicle had a different tread pattern from the other three tires. Officers found six Federal brand "410 gauge" shotgun shells near the body.

Testimony revealed that four or five weeks prior to October 2, 1987, Patricia Casey, a Fall River resident, met the victim, a drifter named Edward Cereto. At the time, Cereto was living in a septic tank at M & S Concrete Company's storage yard near Casey's residence at 26 Mt. Hope Avenue in Fall River. Casey hired Cereto to do some odd jobs and permitted him to live in a storage area under a three-family home she owned at 8 Mt. Hope Avenue. Casey testified that Cereto did not show up for work as she expected on October

2, 1987. Casey checked the storage area but Cereto was not found. The following day Casey called Freetown police and gave them a description of Cereto. A newspaper article published October 3, which reported that police had found a body in Freetown state forest, prompted Casey's call. Casey's description of Cereto matched that of the victim.

On Sunday night, October 4, at approximately 6:45 P.M., Bruce Frank, accompanied by a friend, visited Patricia Casey. Fall River police Officer Robert Aguiar and State Trooper Deborah Bruce arrived shortly after Frank. The officers spoke with Frank and left the house with him. The three walked to a woodpile in an adjacent yard. Frank lifted up boards in the woodpile and revealed a 410 gauge Mossberg 183DA shotgun. Frank admitted the gun belonged to him. Ballistics tests showed that all six shotgun shells found near the Cereto's body were fired from Frank's shotgun.

Earlier in the day on October 4, at approximately 1:00 P.M., State Troopers Deborah Bruce and Jose Gonsalvez questioned Steven A. Costa, the defendant, at his Fall River home. The defendant's parents and his brother were present. The conversation lasted approximately one-half hour. The troopers asked the defendant where he had been during the evening of October 1. The defendant said that after work he had driven with Bruce Frank and another person, identified only as "Timmy," to New Hampshire. The defendant said they had gotten two flat tires, which caused them to delay their return to Massachusetts until the afternoon of October 2.

Later on October 4, at approximately 4:30 P.M., State Trooper Kevin Butler and Freetown police detective Alan Alves returned to the defendant's home. They asked the defendant to accompany them to the Fall River police station for further questioning. The defendant drove his own automobile, a 1976 Pontiac Grand Prix, and followed the police to the station. The defendant parked his car a block or two from the station house. Detective Alves met the defendant and brought him into a conference room. In the meantime, Trooper Butler went to inspect the defendant's vehicle.

Trooper Butler observed that the vehicle had three tires of identical brand with a correspondingly similar tread pattern. The tread and brand of the left rear tire were different from the other three. Trooper Butler returned to the police station after taking instant photographs of the tires and tire treads.

At about 5:00 P.M., Trooper Butler, Detective Alves, and Trooper Jose Gonsalvez proceeded to question the defendant. Before initiating the questioning, Trooper Butler advised the defendant of his Miranda rights. The defendant signed a State police interrogation form thereby acknowledging that he had been advised of his rights and that he understood them. At the outset, Troopers Butler and Gonsalvez advised the defendant that his story was inconsistent with one they had received from Bruce Frank. In response, the defendant repeated the story he had told officers earlier in the day — that he had gone to New Hampshire on Thursday, October 1, and returned Friday afternoon, October 2. When the officers questioned the defendant about the details of his excursion to New Hampshire, the defendant could not provide specifics, such as the route travelled, bars visited, or the names of the cities or towns where the flat tires were repaired. Trooper Butler next showed the defendant photographs of his tire tread and of the tread found near Cereto's body. The defendant noted the similarity, but indicated that he had no idea how his car could have been involved since he had parked his car on Duke Street before he left for New Hampshire.[1] At that point, defendant said he had "[n]o recollection whatsoever as to his activities on the night in question."

Trooper Butler and, a few minutes later, Trooper Gonsalvez, left the room. Detective Alves, now alone with the defendant, informed him that his story would be more believable if he could provide some details of the journey. The defendant, as Detective Alves testified, repeated his earlier statement and said that he fell asleep in the car after leaving Fall River on October 1. The defendant added that he did not wake up until the trio returned from New Hampshire at

---

[1]The defendant earlier said that Timmy had driven to New Hampshire.

4:00 P.M. the following day. Detective Alves pointed out that, if true, the defendant would have been asleep for a period in excess of nineteen hours, including the period when two of the car's tires went flat and were subsequently repaired. Nonetheless, the defendant maintained that he had been asleep during the trip.

Detective Alves asked the defendant if they could have gone to Freetown State Forest and if Edward Cereto could have been in the car. The defendant denied it. Detective Alves asked how the defendant could be so sure if he had been asleep. The defendant said he just "knew." The defendant also said that he left his car, locked, on Duke Street and that he had the only set of keys. The defendant said that on his return on October 2, his car was in the same condition in which he left it the previous day.

Detective Alves told the defendant that his story was lacking. Trooper Maryann Dill then entered the room. Detective Alves testified: "We began questioning him again. We told him all we wanted was the truth. He [the defendant] indicated that he didn't want to be a canary. I said, 'What do you mean, we're not talking about a broken window here, we're talking about a murder. What do you mean you don't want to be a canary?' . . . Then [the defendant] grabbed photos [of the scene] that were in the room . . . and he said, 'You missed something.' We questioned what he was talking about and he said, 'The shells.' He said, 'He loaded the shotgun,' and we could get fingerprints off of them. At that time we said, 'Well, who's he?' At that moment he didn't mention who he was. Then he said, 'Look I'm going to tell you this once and only once, so here it is.' And at that time [the defendant] made a statement implicating himself, Bruce Frank, [and his cousins] Michael Costa, and Kevin Costa." Detective Alves reduced the statement to writing, and the defendant signed it.

The defendant told the officers that he picked up Bruce Frank and drove to the Riviera restaurant and bar in Fall River. They met Kevin and Michael Costa (cousins of the defendant), Bruce Frank's sister, and a couple of friends.

The defendant had three or four beers and a couple of shots of "Yukon Jack" whiskey. At about 9:00 P.M., the defendant, with his cousins, went to the China Royal restaurant. On the way the defendant parked his car outside of Bruce Frank's home because he did not want to drive.[2]

At the China Royal, the defendant ate dinner, shared a "scorpion bowl," and had a couple more beers. After leaving the China Royal, the defendant and his two cousins returned to the defendant's car, and observed that the left rear tire was flat. After changing the tire, the defendant walked to the area where Edward Cereto lived. The defendant asked Cereto if he knew who flattened the tire. Cereto did not respond. Cereto came outside and the defendant asked him if he were working with the police to bust him for possession of marihuana.[3] Cereto would not answer. The defendant, with Michael and Kevin Costa, began pushing and slapping Cereto. Cereto still would not answer. Bruce Frank walked over and said, "Let's go shooting and really scare him, I'll go get my gun." Frank returned with his gun, a 410 gauge shotgun. They forced Cereto into the trunk of the defendant's automobile. They got into the defendant's car and the defendant drove sixteen miles to the Freetown State Forest. The defendant drove into the forest, stopped his automobile on Ledge Road, and the four alighted from the automobile. The defendant opened the trunk and they removed the victim. Bruce Frank then shot Cereto three or four times. Frank then reloaded the shotgun and handed it to Kevin Costa and said, "Go ahead, do it." Kevin Costa then shot the victim. Frank took back the gun, reloaded, handed it to Michael Costa, and said, "Go ahead." Michael Costa said, "No." Frank kept repeating, "Do it." Michael Costa kept saying "No." Frank then handed the defendant the gun and said, "Do it." The defendant took the gun and shot Cereto in the

---

[2] At the time Eddie Cereto and Bruce Frank lived at 8 Mt. Hope Avenue: Bruce Frank in a third floor apartment and Eddie Cereto in the storage area.

[3] The defendant believed that Cereto was an informant because the police would always pick Cereto up and drop him off.

chest. The defendant gave the gun to Frank, got in his auto-
mobile and started the engine. Bruce Frank, Michael Costa
and Kevin Costa got into the car and the four left the scene.
The defendant dropped Kevin and Michael Costa off at their
home around 4:00 A.M. The defendant spent the night at
Bruce Frank's house.[4]

An autopsy of Cereto's body revealed six gunshot wounds:
three in the head (two in the face and one in the ear), two in
the chest, and one in the groin. The pathologist who per-
formed the autopsy determined that the victim died from
"multiple gunshot wounds." The pathologist could not deter-
mine which wound was inflicted first. He testified that the
head wounds alone, or the chest wounds alone, could have
caused Cereto's death.

The edges of the gunshot wounds to the head were burned
and charred, indicating that the barrel of the gun had been
held against the skin or very close to it. The absence of pellet
wounds or pellet marks around the two entrance wounds on
the face also suggested that the wounds resulted from con-
tact or near contact shots. The other gunshot wounds on the
body appeared to have been inflicted from some distance
away.

The pathologist noted that Cereto's shirt and beard were
burned on the right side. He found burns on the inner arm
extending up the neck and into the beard on the right side.
There were burns on the right pant leg. The skin of the right
leg was blackened. The pathologist found pellet marks above
and below the two chest wounds, and to the side and around
the groin wound. The groin wound extended toward the
head, indicating that it was likely Cereto was lying down
when the shot was fired. The groin wound was not the cause
of death.

Peggy Ann DeMoura, who lives across the street from the
concrete company, testified that between 1:00 and 1:30 on

---

[4]At separate trials, Bruce Frank and Kevin Costa were convicted of first
degree murder and kidnapping. This court reviewed and affirmed Kevin
Costa's convictions. See *Commonwealth* v. *Costa*, 407 Mass. 216 (1990).
Michael Costa pleaded guilty to second degree murder and kidnapping.

the morning of October 2, 1987, she was awakened by the sound of automobiles in the street. She got up and looked out the window to see what was going on. She saw two cars, one of which she described as a Grand Prix. Two "guys" got out of the other vehicle and walked to the concrete company and "went on top of that cement thing," and tried to pull the cover off. In the meantime, the Grand Prix circled the block. Both cars "peeled out" twenty minutes after arrival.

Donna Camara testified that during the early morning hours of October 2, 1987, she was in her second-floor apartment at 8 Mt. Hope Avenue. At approximately 2:30 A.M., she heard some people going upstairs to the third-floor apartment where Bruce Frank lived. After a few minutes, she heard them leave. She looked out of her window and saw three people going across the street to Steven Costa's car.

In October, 1987, the defendant was indicted for murder and kidnapping. In June, 1988, the defendant was tried before a jury. The jury found him guilty of kidnapping and murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. The judge sentenced the defendant to life imprisonment without possibility of parole, G. L. c. 265, § 2 (1990 ed.), for the murder conviction, and a concurrent eight to ten year sentence for the kidnapping conviction. On appeal, the defendant advances four arguments claiming error. The defendant also seeks relief pursuant to G. L. c. 278, § 33E (1990 ed.). We affirm the convictions for the reasons set forth below.

1. *Motion to suppress.* The defendant claims that the trial judge erred in denying his motion to suppress statements made during the October 4 interrogation conducted by Detective Alves of the Freetown police and State Trooper Maryann Dill. The subject interrogation commenced at approximately 5:00 P.M. and lasted approximately three hours. At the hearing on the motion the defendant testified that he told the police officers several times during the interrogation that he had nothing more to say. The defendant maintains that interrogating officers refused to respect his right to remain silent and continued to interrogate him. The defendant

argues that statements made after he invoked his right to remain silent, including the signed statement, must be suppressed. The trial judge denied the motion and set forth her reasons in a memorandum of decision. The trial judge found that the defendant "was aware of his Miranda rights and that he made a voluntary, knowing and intelligent waiver of those rights." The judge also concluded that the "defendant did not state unequivocally at anytime that he did not wish to be questioned any further." The judge found in conclusion that "[t]he only thing that comes close to defendant exercising his right to terminate the interrogation is an indication on his part that he did not want to get a friend in trouble and [did not want to] sing like a canary. This without more, is not sufficient to mandate the conclusion that a constitutional impropriety occurred." We agree with the trial judge and hold that the denial of the motion to suppress was proper.

The defendant asks us to review the trial judge's findings of fact with regard to his invocation of his right to remain silent. "In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). "On a motion to suppress, '[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses . . . .' " *Id.*, quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). Where there has been conflicting testimony as to a particular event, a judge's resolution of such conflicting testimony invariably will be accepted. *Commonwealth* v. *Spagnolo*, 17 Mass. App. Ct. 516, 517-518 (1984).

The trial judge's decision was not clear error. At the hearing on the motion to suppress, two officers testified unequivocally that the defendant did not say, at any time, that he had nothing further to say.[5] Moreover, when the trial judge asked the defendant when he made his desire known to the officers,

---

[5]During the interrogation the defendant said he had "no recollection" of his activities and that "he didn't want to be a canary" or "squeal" on his friends. While these statements arguably demonstrate the defendant's reluctance to speak, taken together, they fall short of what is required to

the defendant said, "I told them right from the beginning." When asked to whom he told this, the defendant could not remember the officer's name. Further supporting the judge's decision was the defendant's forthcoming demeanor during the interrogation as evidenced by his initiation of the discussion of the shotgun shells after viewing the photograph of the scene where Cereto's body was discovered. In the absence of any claim of physical coercion, threats, trickery, deception, or other impropriety by the police, the judge's decision deserves to stand.

2. *Jury instruction.* The defendant next argues that the trial judge's instruction on the third prong of malice was error because the judge precluded the jury from considering evidence of intoxication in determining whether the defendant possessed the requisite knowledge of the circumstances in which he acted. See *Commonwealth* v. *Sama,* 411 Mass. 293, 298 (1991). The defendant concedes that the trial judge properly instructed the jury on the first two prongs of malice: intent to kill and intent to do grevious bodily harm. See *Commonwealth* v. *Grey,* 399 Mass. 469, 470 n.1 (1987). The trial judge instructed the jury as follows: "On the third form of malice, that is he intended to do an act creating a plain and strong likelihood that either death or grievous bodily harm would follow the contemplated act, the Commonwealth is not required to prove a specific intent, as the law considers that form to be general intent and, when general intent is involved, voluntary intoxication does not operate to prevent a defendant from forming the general intent as specified in that third form of malice."[6]

There was error in the charge but the error did not create a substantial likelihood of a miscarriage of justice (see *Commonwealth* v. *Burke,* 414 Mass. 252, 265 [1993]) in light of the jury's finding the defendant guilty of murder in the first

invoke the right to remain silent. See *Commonwealth* v. *Hussey* (*No. 1*), 410 Mass. 664, 671, cert. denied, 112 S. Ct. 601 (1991).

[6]The judge repeated the instruction in essence in response to a jury question.

degree by reason of deliberate premeditation and extreme atrocity or cruelty. The judge properly instructed the jury on the first two prongs of malice, both of which require a jury's finding of specific intent. As part of her instruction on the first two prongs of malice, the judge instructed the jury to consider evidence of intoxication in determining whether the defendant possessed the requisite specific intent. As the evidence presented at trial regarding intoxication was not sufficient to negate findings of deliberate premeditation and extreme atrocity or cruelty, as evidenced by the verdict returned by the jury after proper instructions on these theories of first degree murder, the defendant was not prejudiced by the complained-of omission of language from the instruction on the third prong of malice. Further, evidence introduced at trial supports the conclusion that the defendant was capable of having the knowledge required for the crimes charged and the requisite specific intent.[7] Accordingly, there was no reversible error.

3. *Prosecutorial misconduct.* The defendant argues that the prosecutor impermissibly appealed to the sympathy of the jury, injected his own personal beliefs and opinions, and disparaged the defense during closing argument. The defendant maintains that the judge's instruction to the jury did not cure the resulting prejudice. We disagree.

At the outset, we note that defense counsel failed to object to the prosecutor's closing argument at trial. Thus the standard of review is whether there is a substantial likelihood of a miscarriage of justice. We consider the complained-of passages in the context of the entire argument and in light of the judge's instructions to the jury. *Commonwealth* v. *Yesilciman, supra* at 746.

---

[7]On the crucial evening, the defendant drove his automobile, changed a flat tire, sought out the victim, beat the victim, put the victim in his trunk, drove from Fall River to the Freetown State Forest — about sixteen miles, drove down the unlit dirt roadway in the forest to the spot where they shot the victim, and, after the shooting, drove back to Fall River and took his cousins home.

We have reviewed the prosecutor's closing argument. The passages complained of do not exceed the bounds of propriety. See generally *Commonwealth* v. *Kozec*, 399 Mass. 514 (1987). The passages amount to little more than enthusiastic rhetoric, strong advocacy, and excusable hyperbole. Any adverse impact, were it to exist, resulting from the summation would have been cured by the judge's charge to the jury. The judge told the jury that closing arguments were not evidence and called upon the jury to decide the case based on the evidence.[8] Accordingly, we hold there is no substantial likelihood of a miscarriage of justice.

4. *Jury deliberations.* The jury were given the case on Friday, June 24, 1988. The jury were not sequestered during deliberations. On Monday, June 27, the jury resumed deliberations. On his return to the courthouse after the weekend, the foreman told a court officer that he received a telephone call the prior Friday evening from a man who identified himself as "Frank." The caller hung up after stating he had reached the wrong number. The foreman was concerned about the call due to the references to Bruce Frank made during trial. The foreman later told the judge that he asked the other jurors if they had received a similar call over the weekend before he told the court officer of the incident. The jurors told the foreman they had not received any such calls. The judge asked the foreman if the event would affect his ability to judge the case impartially. The foreman said that he preferred to be excused.

The judge then called the jury into the court room and questioned them as a group, asking if the telephone call the foreman received would affect their ability to render an impartial verdict. No juror responded affirmatively. The judge then excused the foreman and subsequently called an alter-

---

[8]The judge instructed the jury: "There are some general instructions that I have for you and [they] could be called cautions or things that ought to be called to mind. One of them is that during your deliberations you should not be governed or influenced by any prejudice, sympathy, fear or favor for or against either side in this case." The judge also instructed the jury that closing arguments do not constitute evidence.

nate juror.[9] The defendant moved for a mistrial claiming that the foreman's revelation impermissibly tainted deliberations thereby rendering a fair trial impossible. The judge denied the motion. On appeal, the defendant claims that the trial judge erred in failing to conduct an individual voir dire of each juror to assess impartiality.

The defendant wrongly assumes that the judge's collective questioning of the jurors constitutes reversible error per se. See *Commonwealth* v. *Campbell*, 378 Mass. 680, 695-696 (1979). Given the circumstances and the concession of defense counsel that the call appeared to be "pure coincidence," we hold that collective questioning of the jury was not improper. The defendant's reliance on *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978), is misplaced. If we assume, as the defendant does, that the rule enunciated in *Jackson* applies where the extraneous influence on the jury is a telephone communication from a misdirected caller — a wrong number, the judge, before conducting an individual voir dire, must first determine whether the incident raises "a serious question of possible prejudice." *Id.* at 800. We cannot say that the subject conduct raised "a serious question of possible prejudice." Accordingly, the judge was not required to conduct an individual voir dire of the remaining jurors. The incident did not deprive the defendant of an impartial and indifferent jury. There was no error.

5. *G. L. c. 278, § 33E.*

The defendant seeks a reduction in the verdict from murder in the first degree to murder in the second degree claiming mitigating factors.[10] We have reviewed the record and conclude that the verdict of murder in the first degree is not "against the law or the weight of the evidence." G. L. c. 278,

---

[9]The defendant does not challenge the removal of the foreman.

[10]The defendant relies on the following facts: (1) his age at the time of Cereto's death — 18 years old; (2) he had consumed alcohol on the night in question; and (3) Cereto had already been shot before the defendant fired the gun.

§ 33E (1990 ed.). See *Commonwealth* v. *Luce*, 399 Mass. 479, 484 (1987). The verdict deserves to stand.

*Judgments affirmed.*