COMMONWEALTH vs. THOMAS J. LYONS.

Berkshire. November 4, 1997. - January 14, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Practice, Criminal,* Defendant's competency, Judicial discretion, Argument by
prosecutor, Capital case. *Evidence,* Expert opinion, Competency.

In a criminal case, the evidence at a hearing on the issue of the defendant's
competence to stand trial warranted the judge's finding that the defendant
was competent, and the judge did not abuse his discretion in relying, in
part, on the testimony of the defendant's expert. [468-471]

At a murder trial, the prosecutor's remarks in his closing argument concerning
the jury's duty were not improper [471-472], and his description of the
murder, based on evidence properly admitted, did not constitute an
improper appeal to the sympathy of the jury [472-473]; further, the
prosecutor's comments on the defendant's testimony, credibility, and
behavior during the trial were not improper statements of the prosecutor's
personal opinion [473-474]: the prosecutor's closing argument, considered
as a whole and in light of the judge's instructions and the evidence. of the
defendant's guilt, did not create a substantial likelihood of a miscarriage of
justice.

No reason appeared on the record of a trial of an indictment for murder in the
first degree for this court to exercise its power under G. L. c. 278, § 33E.
[474]

INDICTMENT found and returned in the Superior Court Depart-
ment on May 21, 1993.

The case was tried before *Francis X. Spina, J.*

*Richard B. Klibaner* for the defendant.

*David F. Capeless,* Assistant District Attorney, for the Com-
monwealth.

LYNCH, J. The defendant, convicted of murder in the first
degree, raises the following issues on appeal: (1) he was not
competent to stand trial; (2) the prosecutor made improper
statements to the jury; and (3) this court should exercise its
power under G. L. c. 278, § 33E, to reduce his murder convic-
tion or order a new trial. We affirm the conviction and offer no
relief under G. L. c. 278, § 33E.

We briefly summarize the facts as the jury could have found them. The victim was the defendant's wife. The defendant had been unhappy with his marriage because his wife worked in New Jersey and he remained in Massachusetts. On April 29, 1993, the defendant told a minister of a church in his neighborhood that he was contemplating suicide. The minister alerted the police who took the defendant into protective custody. The defendant denied thoughts of suicide to a mental health worker, who was of the opinion that the defendant suffered from an adjustment disorder with a depressed mood. The mental health worker believed the defendant's behavior showed no evidence that he had hallucinations, delusions, visions, or that he heard voices, or that he had any other symptoms of psychosis. The defendant was released.

The next day, the defendant did not work as scheduled but stayed in his apartment listening to music. That evening, the victim arrived from New Jersey. As soon as the victim entered the apartment, the defendant hit the victim, whereupon she went across the street to the minister and told him what the defendant had done to her. Soon after, the defendant arrived and attempted to convince the victim to return home. A mental health clinician, who had been telephoned by the minister, spoke with the defendant and asked him whether he heard voices, but the defendant did not respond.[1] The clinician recommended that the couple seek counseling and scheduled an appointment for the following Monday. As the conversation concluded, the defendant suddenly left without saying anything to anyone.

Later that evening, the victim left the parsonage and returned to the apartment. After refusing the defendant's sexual advances the victim locked herself in the defendant's truck parked outside the apartment. The defendant, who had remained inside the apartment listening to music, testified that one song instructed him to put a knife in his wife's heart. He then took a knife from the kitchen, hid it in his sleeve, and went outside to the truck. The defendant testified that he intended to stab the victim in the heart when he left the apartment.

The defendant woke the victim, convinced her to unlock the

---

[1]During the interview, the defendant acted withdrawn, had a vacant look on his face, and began moving his lips without speaking. The clinician's report indicated that he did not believe that the defendant's judgment was impaired. The defendant's behavior did not lead the clinician to recommend involuntary hospitalization, medication, or immediate referrals.

door, distracted her, and then stabbed her. The victim struggled, grabbing the blade of the knife with her hands to stop the defendant.[2] The defendant "straddl[ed] her chest area, sitting on her with [his] knees on her arms," and stabbed her a second time, killing her.[3] The defendant then drove across the State line to New York with the victim's body in the passenger seat.

Early the following morning, the defendant walked into a New York State police barracks and announced that he had just killed his wife. The defendant reportedly stated, "The priest made me do it," and then led the officers to the victim's body in the truck. The defendant was advised numerous times of his Miranda rights and told the police he understood them. The New York authorities described the defendant as calm, polite, and fully cooperative. The defendant answered the officers' questions appropriately and voluntarily elaborated in great detail about the events of the murder. He told officers that he and his wife had argued when she arrived from New Jersey, that he received "visions from the radio,"[4] and that his wife became upset and went outside to lock herself in the truck. He described how he went out to the truck with a knife, convinced her to open the door, and stabbed her. He also said that he threw the knife out of the truck while driving.

1. *Competency.* A pretrial hearing was held on the issue of the defendant's competency to stand trial during which the defendant and the Commonwealth presented psychiatric experts.[5]

Competency to stand trial requires that the defendant have

---

[2]The defendant recounted the details of the victim's struggle at trial. He testified:

> "So she turned over her shoulder to look and then I fumbled with the knife and pulled it out and then brought it down into her chest area and I think I must have just nicked her, and then I started climbing into the truck. She didn't say anything at that time, but as I started climbing into the truck words did come out her mouth and the words were, 'You're killing me.' "

[3]The defendant inflicted the second blow with such force that the stab wound passed through the victim's breastbone, ribs and ultimately, her heart.

[4]The defendant testified that he was listening to the radio, which he claimed gave him "instructions" to put a knife "through my wife's heart."

[5]The judge did not issue written findings of fact or conclusions of law. The record reveals that the judge also reviewed two additional psychiatric evaluations of the defendant dated June 2, 1994. Dr. Martin Kelly, a psychiatrist,

"[1] sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and . . . [2] a rational as well as factual understanding of the proceedings against him." *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971), quoting *Dusky* v. *United States*, 362 U.S. 402 (1960). The Commonwealth has the burden to prove by a preponderance of the evidence that the defendant was competent. *Commonwealth* v. *Kostka*, 370 Mass. 516, 522 (1976). When reviewing the judge's finding of competency, we give substantial deference to his findings of fact. See *Commonwealth* v. *Prater*, 420 Mass. 569, 574 (1995).

The Commonwealth's expert, Dr. J. Roger Goldin, examined the defendant shortly before the hearing on June 6, 1994, and reviewed the defendant's records.[6] Dr. Goldin testified that the defendant correctly identified individuals in response to questions, was aware of the processes in court, and understood such various legal concepts as testimony, plea bargaining, and witnesses and their roles. Dr. Goldin also testified that the defendant revealed an ability and a willingness to relay the facts of the murder to his attorney.[7] He concluded that the defendant was able to consult with his attorney with a reasonable degree of rational understanding and maintain a factual understanding of the charges, the likely consequences, and court procedure.

The defendant's expert, Dr. Leonard A. Bard, examined the defendant for two hours on May 9, 1994, a month prior to the hearing. Dr. Bard also believed the defendant had a factual

reported on his evaluation of the defendant on the issue of criminal responsibility. The second report was a competency evaluation of the defendant conducted by Dr. Frank DiCataldo, a forensic psychologist, at Bridgewater State Hospital. The judge ordered defense counsel to turn over copies of the report to the prosecutor in redacted form. The judge also directed that the Commonwealth's psychiatric expert receive copies of the reports for his examination of the defendant's competency.

[6]Dr. Goldin testified that he had previously examined the defendant on the issue of competence on May 6, 1993. At that time, Dr. Goldin had doubts about the defendant's competence to stand trial and recommended a longer period of observation at Bridgewater State Hospital.

[7]Dr. Goldin concluded the defendant had sufficient ability to discuss the facts of his case with his counsel. Dr. Goldin issued the warnings in *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974), that any information about the facts of the murder might not be privileged. The defendant told Dr. Goldin that he understood that warning and would not talk about the case to him, but Dr. Goldin asked him whether he would be able to discuss those facts of his case with his attorney and the defendant replied affirmatively.

understanding of court procedures and the participants' roles; however, he concluded that the defendant held odd religious beliefs that impaired his ability to have a rational understanding of court processes.

The primary difference of opinion between the experts was whether the defendant's religious beliefs were delusional so as to impair his ability to have a rational understanding of the court proceedings. Both doctors were cross-examined and questioned by the court.[8] At the conclusion of the hearing, the judge ruled from the bench that the defendant was competent to stand trial.

The defendant argues that, because the judge's ruling relied in part on the testimony of the defendant's expert, the judge abused his discretion in reaching a contrary conclusion of competence. We do not agree.

We have stated that "[j]udicial experience with [expert] testimony makes it abundantly clear that it would be unrealistic to treat an opinion . . . by an expert on either side of . . . [an] issue as conclusive." *Commonwealth v. Prater, supra* at 575, quoting *Commonwealth v. DeMinico*, 408 Mass. 230, 235-236 (1990). See *Commonwealth v. Lamb*, 372 Mass. 17, 24 (1977). It was properly within the judge's discretion to rely solely on the testimony of either Dr. Bard or Dr. Goldin but he was not obliged to believe the testimony of either expert witness. See *Commonwealth v. Kappler*, 416 Mass. 574, 579 (1993); *Commonwealth v. Shelley*, 381 Mass. 340, 347 (1980). The fact that the judge made no mention of the Commonwealth's expert, Dr. Goldin, when ruling on the defendant's competence does not demonstrate that the judge disregarded his testimony. Moreover, where there was ample support in the record to support the judge's finding of competence, we reject the defendant's contention that the judge, in citing Dr. Bard's testimony yet finding the defendant competent to stand trial, found facts that were unsupported by the evidence.[9] See *Commonwealth v. DeMinico, supra* (judge's competency determination not unsupported by

---

[8]The Commonwealth's cross-examination of Dr. Bard revealed the defendant had previously cut his wrists on several occasions to gain admission to a mental institution.

[9]Even if the judge did rely solely on Dr. Bard's testimony, the defendant overlooks Dr. Bard's testimony during cross-examination that was consistent with the judge's finding of competence. Dr. Bard's testimony supported the judge's findings that the defendant's delusions did not impair his competency

other evidence where judge disbelieved expert testimony, reviewed defendant's medical history, and observed defendant's demeanor at trial); *Commonwealth* v. *Kostka, supra* at 523 (conflicting testimony of psychiatric experts did not preclude finding of competence).

2. *Prosecutorial statements.* The defendant argues that we should reverse his conviction because of certain alleged improprieties in the prosecutor's closing remarks. Defense counsel did not object at trial. Thus, our review is limited to determining whether there has been a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Stockwell, ante* 17, 23 (1997); *Commonwealth* v. *Marquetty,* 416 Mass. 445, 450 (1993). Although not dispositive, we consider the fact that the defendant did not object to the statements at trial as "some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Mello,* 420 Mass. 375, 380 (1995), quoting *Commonwealth* v. *Sanchez,* 405 Mass. 369, 375 (1989). We review the prosecutor's remarks in the context of his entire closing argument, the judge's instructions to the jury, and the evidence produced at trial. See *Commonwealth* v. *Mello, supra*; *Commonwealth* v. *Costa,* 414 Mass. 618, 629 (1993); *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 746 (1990).

The defendant's first contention is based on the prosecutor's remarks that the jury perform their duty and return a verdict of guilty.[10] The prosecutor's direction that the jury "do [their] du-

to stand trial. The following excerpt of the Commonwealth's cross-examination is demonstrative:

THE PROSECUTOR: "Do you feel that at present the [d]efendant . . . is out of touch with reality?"

THE WITNESS: "I believe that his delusional system is very focused, and it is focused upon his religious beliefs. In those areas where his religious beliefs apply, I believe that he is not in contact with reality. In those areas where they are not related, such as his ability to manage his own funds or to care for his hygiene, I believe he is in contact with reality."

THE PROSECUTOR: "So that, therefore, the only thing he is out of touch with reality relates to the criminal charges pending against him?"

THE WITNESS: "No, any time where he — where his religious beliefs are involved, those beliefs interfere with his contact with reality. Obviously, the most — the clearest evidence of that is with this case, yes."

[10]The prosecutor argued in his closing: "Now, [the defendant] had made up his mind, ladies and gentlemen, and then he killed [the victim]. And you as members of the Jury will make up your minds. But you will not do so with

ties as jurors to return a just verdict" was not improper, especially where the prosecutor also urged the jurors to consider all the evidence to return a verdict in a rational manner, rather than with "vengeance."

We also reject the defendant's argument that the prosecutor improperly appealed to the jury's sympathy by presenting a "grisly" depiction of the victim's murder.[11] The prosecutor may argue inferences from the evidence favorable to his case. See *Commonwealth* v. *Donovan*, 422 Mass. 349, 357 (1996); *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994). The prosecutor's description of the murder did not refer to facts not properly in evidence. The defendant cannot take issue with the gruesome facts of the killing where he himself vividly recounted the details of the stabbing. Moreover, we note that "[t]o the degree the recitation of the evidence was inflammatory, that was inherent in the odious . . . nature of the crime[s] committed." *Commonwealth* v. *Sanchez*, 405 Mass. 369, 376 (1989), quoting *Commonwealth* v. *Ingram*, 14 Mass. App. Ct. 999, 999 (1982). The prosecutor's remarks were characteristic of "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," and did not cross the line between fair and improper argument. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997); *Com-*

---

vengeance or in a shameful way. You will have the law to guide you, you'll have the evidence to guide you. You will not do so with deceit. You will follow your oaths and your duties as jurors to return a just verdict. And you will not ignore the pleadings and the cries of [the victim]. You will consider your evidence, all of it, and together you will then come to a just verdict.

"I suggest to you there is one just verdict in this case, ladies and gentlemen: that the defendant is guilty as charged, that he is guilty of first degree murder, and that should be and will be your just and true verdict."

[11]The prosecutor argued: "[T]he [d]efendant does not suffer from [a mental illness], others suffer. [The victim] suffered from that condition. She suffered not just by the loss of her life but by the brutal and degrading way in which she felt the thrust of the knife into her chest, to bleed to death and then to be found the way she was in that condition by the police. And her family suffered [from the defendant's] condition by her horrible loss. And the good people of this county, law abiding citizens have suffered by his condition, the violation of their laws and the rending of the social fabric of this county that he caused when he took that knife and stabbed [the victim]. . . . I suggest what [the defendant] deserves is the outraged declaration of his guilt, your outrage, but he would suggest otherwise, because the evidence points clearly that he is guilty, that he is responsible, and he is guilty as charged."

*monwealth* v. *Judge*, 420 Mass. 433, 452 (1995); *Commonwealth* v. *Costa*, 414 Mass. 618, 628 (1993).[12]

We additionally reject the defendant's argument that the prosecutor improperly offered his personal opinion on the defendant's lack of criminal responsibility by commenting on the defendant's behavior during trial and attacking the defendant's religious explanation for his act.[13] The statements regarding the defendant's demeanor during trial and his coherency on the witness stand were not improper because they summarized evidence that had been introduced during trial and drew logical conclusions based on that evidence. *Commonwealth* v. *Curtiss*, 424 Mass. 78, 83 (1997). Neither was it improper for the prosecutor to argue that the evidence in the case demon-

---

[12]The defendant also argues that the prosecutor improperly appealed to the jury's sympathy during his cross-examination of Dr. Bard. Specifically, the defendant challenges an unanswered question by the prosecutor: "Well . . . you would agree that if the Jury accepts this delusion and a lack of criminal responsibility on the part of the [d]efendant, he'd get away with murder, wouldn't he?" The defendant objected to this question on the ground that the witness should not be permitted to discuss the legal ramifications of his theory of defense. The judge overruled the objection; however, the prosecutor never repeated the question. The defendant's asserted error, that the question improperly caused the jury to consider the consequences of their verdict, was not made known to the judge at trial. See Mass. R. Crim. P. 22, 378 Mass. 892 (1979); *Commonwealth* v. *DeCastro*, 24 Mass. App. Ct. 937, 939 (1987). Accordingly, we review the question to determine whether its admission was error resulting in a "substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Avellar*, 416 Mass. 409, 422 (1993). Dr. Bard did not answer the question, nor did the prosecutor resume that line of questioning. We conclude that, in light of all the testimony, the unanswered question did not create a substantial likelihood of a miscarriage of justice.

[13]The prosecutor argued: "Now, there is no delusion, ladies and gentlemen, as I said. There's simply a shameless use of God and religion by the [d]efendant in order to convince [his expert,] other health professionals, and now you that he is not responsible for this crime. I suggest that the evidence points to you and tells you that it is something to be seen through.

"There is no suggestion here, ladies and gentlemen, that come May 1st the defendant has not had some spiritual, perhaps religious awakening and he's become interested in the Bible as a result of becoming sober and going to AA. But religious fervor does not make one crazy. And I think it's all the more shameless and shameful, that giving credit to God for having saved him from the horrors of drink, he now will say it caused him to kill. And look at this delusion that he would foist upon you, ladies and gentlemen. It's a voice from God through that song. The first opportunity he has to talk to people about it, what does he say? 'The minister made me do it, he's the Devil.' No mention of the song, no mention of God, in fact. It's inconsistent."

strated that the defendant's testimony was not credible. This is not a case where the prosecutor interjected his own personal beliefs as to the defendant's credibility. See *Commonwealth* v. *Yesilciman, supra* at 746. Rather, the prosecutor's statements were essentially arguments based on inferences the jury could have properly drawn from the evidence at trial. We do not believe the prosecutor's argument was unduly suggestive as we can fairly assume a "certain measure of jury sophistication" in sorting out excessive claims. *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). In addition, the judge properly instructed the jury on what constituted evidence, how credibility should be assessed, and the requirement of proof beyond a reasonable doubt. In light of the prosecutor's entire closing argument, the judge's instructions to the jury, and the evidence of the defendant's guilt, we conclude the summation did not create a substantial likelihood of a miscarriage of justice.

3. *General Laws c. 278, § 33E.* Our review of the record reveals there was overwhelming evidence of the defendant's guilt, and we see no basis for concluding that a reasonable likelihood of a miscarriage of justice exists.

*Judgment affirmed.*