## COMMONWEALTH *VS.* WEN CHAO YE.

Nos. 99-P-471 & 99-P-2145.

Middlesex. October 10, 2000. - October 17, 2001.

Present: PERRETTA, GILLERMAN, & PORADA, JJ.

*Identification. Evidence,* Identification. *Practice, Criminal,* Instructions to jury, Argument by prosecutor, New trial. *Assault and Battery by Means of a Dangerous Weapon.*

At the trial of indictments for armed robbery and assault and battery by means of a dangerous weapon, the judge was warranted in determining that the defendant had failed to show by a preponderance of the evidence that the defendant was subjected to a showup that was so unnecessarily suggestive as to be conducive to a mistaken identification. [854-856]

This court concluded that, even assuming that it was error for the judge in a criminal case to omit from his charge the defendant's requested jury instructions on identification and on the battery element of assault and battery by means of a dangerous weapon, the assumed errors did not create a substantial risk of a miscarriage of justice, where, in the first instance, the instruction, viewed as a whole, was sufficient to apprise the jury of the possibility of a mistaken identification, what circumstances they should consider in determining the weight to be given the identification testimony, and the Commonwealth's burden of proof, and where, in the second instance, the real issue was not whether a battery occurred but whether the defendant was one of the victim's assailants. [856-858]

At a criminal trial, there was no substantial risk of a miscarriage of justice created by alleged improprieties in the prosecutor's closing argument, in light of the prosecutor's entire closing argument, the judge's instructions to the jury, and the evidence of the defendant's guilt. [858-859]

A claim of ineffective assistance of counsel for the defendant in a criminal case was not supported by the fact that counsel failed to interview a physician who treated the defendant at the time of his arrest and who, it was alleged, would have supported the defendant's assertion that he neither understood nor spoke English, where the credibility, weight, and impact of posttrial affidavits of the physician and trial counsel in support of this contention were matters left to the discretion of the trial court, and where there was no showing that the alleged deficiency in pretrial preparation probably resulted in forfeiture of a substantial defense. [859-860]

INDICTMENTS found and returned in the Superior Court Department on May 16, 1996.

The cases were tried before *Thayer Fremont-Smith*, J., and a motion for a new trial, filed on November 5, 1999, was heard by him.

*Stella Robinson* for the defendant.

*Kimberly Diaz Peterson*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from his convictions on a joint venture theory on indictments charging him with armed robbery and assault and battery by means of a dangerous weapon,[1] the defendant claims that the trial judge erred in denying his motion to suppress the one-on-one identification made of him at a showup and in instructing the jury on the issues of identification as well as in failing to instruct on battery as a lesser included offense of assault and battery with a dangerous weapon. He also argues that the prosecutor's closing argument was riddled with improper statements. The defendant's direct appeal was consolidated with his appeal from the denial of his motion for a new trial. That motion was brought while the direct appeal was pending and is based upon a claim that the trial judge abused his discretion in finding that the affidavit in support of the motion was not credible. We affirm the convictions and the ruling on the motion for a new trial.

1. *The evidence.* There was evidence to show that on the late night of May 5, 1996, Yoshio Uda closed his restaurant, situated in Lexington, and walked across Muzzey Street to his automobile which was parked in a well-lighted lot. He was carrying a blue bag containing cash and credit card receipts. After he entered his car and started its engine, three young Asian males ran in front of the car and blocked Uda's departure. One of the males, a juvenile, pointed an Uzi machine gun at the windshield while the defendant and the third assailant climbed into the backseat of the car. The juvenile quickly joined them. The juvenile then put the Uzi to the back of Uda's head and warned him not to look back or he would kill him. Next the juvenile asked, "[W]here's the money?" and Uda motioned to the bag beside him.

---

[1]The defendant was also found guilty on an indictment charging him with unlawful possession of ammunition, but that conviction was placed on file and is not in issue.

While the juvenile forced Uda's head to the windshield with the Uzi, another assailant reached over to grab the bag. When Uda looked back at the men, the juvenile again pushed the Uzi to his head. The other two males then took Uda's wallet, gold necklace, watch, and car keys. After warning Uda that they would kill him if he did not remain in the car, the three males fled toward a white car, also parked on Muzzey Street. During his ordeal, Uda was able to observe the defendant's height, face, hair, and attire. He also had left his door slightly ajar in order to illuminate the interior of the vehicle in the hope that someone might see what was happening.

Paul Thomas saw it all from the window of his mother's office, located across the street from Uda's restaurant. He saw three men, including the defendant and a juvenile, who was carrying a machine gun, stand in front of and get into Uda's car. He yelled to his mother, telling her to call the police. Thomas could see directly into the illuminated interior of the car. He saw the juvenile push the gun into the back of Uda's head and Uda pass items over the front seat to his assailants in the back. He also saw the males pulling items from Uda's person. As he watched, Thomas made mental note of the defendant's race, hair, build, height, and clothing.

Responding to the call from Thomas's mother, Lexington police Officer George Snell arrived at the scene in time to see three men running toward a white car. When they saw Snell, they veered from the car and ran off in different directions. Uda and Thomas, without discussing their observations with each other, described the assailants to the police.

Assisted by the State police and one of their dogs, Max, the Lexington police sealed off the center of the town and searched the neighborhood. The dog found the defendant and the juvenile hiding in bushes a short distance from Muzzey Street. The suspects fought with Max and the canine officer, and the defendant sustained a bite to his forearm and shoulder. The defendant and juvenile were handcuffed and brought to the scene of the robbery. The defendant was taken from the cruiser and brought to the well-lighted parking lot. Uda and Thomas, both inside Thomas's mother's office and both being observed by a police officer to ensure that one did not influence the other,

immediately identified the defendant as one of the assailants. Next, the juvenile was brought to the parking lot, and, again, both Uda and Thomas identified him as the assailant holding the Uzi. The defendant and the juvenile were arrested and taken to the Lexington police station.

We digress. While searching the neighborhood for the assailants, the police found Uda's blue bag and its contents as well as a backpack containing an Uzi, found to be a facsimile and not an operable weapon upon close inspection, and live ammunition. The next day, the police found Uda's wallet in the area where the defendant had been apprehended.

After the defendant and the juvenile were arrested and taken to the police station, they were subjected to an inventory search. Pursuant to that search, the police found a single mesh-type glove and Uda's watch in the defendant's pockets. Cash, folded in a triangular fashion used by Uda, and his gold chain were taken from the juvenile who claimed that he had won the necklace in a lottery. Next, the defendant was taken to the hospital for treatment of the wounds inflicted upon him by Max. During his hospital examination, the defendant professed that he spoke only Chinese and could not understand English. However, once Snell made it clear to the defendant that it was in his best medical interests to speak to the doctors, the defendant acknowledged that he understood Snell and then related to the doctor his medical history, including the date of his most recent tetanus shot, and answered all the doctor's questions in English and without difficulty.

Testifying on his own behalf through an interpreter, the defendant related that on the night in question, he arranged for a ride to Boston with one John Linsky. He stated that the arrangement was made through another person because he spoke only Chinese and could not communicate directly with Linsky. The defendant went on to relate that he and Linsky, along with several other passengers in the car, made several stops before proceeding to Lexington. While stopped in Lexington, three of the passengers got out of the car, but he remained where he was. According to the defendant, the next thing he knew was that those who had left the vehicle returned and then fled. Because he did not understand what was happening, he fol-

lowed the fleeing men. More specifically, he followed the juvenile with the Uzi by "his instinct."

As for the glove and Uda's watch taken from his person during the inventory search, the defendant explained that he first saw those items at the police station when a police officer asked, through an interpreter, whether those items were his and then put them into a bag containing his belt and cigarette lighter. He also refuted Snell's testimony and insisted that he had not understood the questions put to him by the physician taking his medical history, that it was Snell who had responded to the doctor's inquiries.

2. *The identifications of the defendant.* It is the defendant's claim that the identifications made of him by Uda and Thomas at the showup on the night of the events in question were unnecessarily suggestive and that the Commonwealth failed to show by clear and convincing evidence that their in-court identifications had a source independent of the impermissibly suggestive showup. Analysis of this argument is controlled by those principles recently reiterated in *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999):

> "Where a defendant alleges that witness identifications arise from unnecessarily suggestive circumstances, the 'defendant has the burden to prove, by a preponderance of the evidence, that the witness was subjected by the State to a pretrial confrontation . . . "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny the defendant due process of law.' *Commonwealth* v. *Otsuki*, 411 Mass. 218, 232 (1991), quoting *Commonwealth* v. *Venios*, 378 Mass. 24, 26-27 (1979). The judge, in considering whether identification testimony should be suppressed, must examine 'the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive.' *Commonwealth* v. *Otsuki, supra* at 232-233. If a defendant establishes that a confrontation was unnecessarily suggestive, then the identifications are excluded based on due process rights guaranteed by art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Johnson*, 420 Mass. 458, 462-465 (1995); *Commonwealth* v. *Botelho*, 369 Mass. 860, 865-869 (1976). Subsequent identifications are admis-

sible only if the Commonwealth demonstrates by clear and convincing evidence that the identifications have an independent source. See *Commonwealth* v. *Johnson, supra* at 463, citing *Commonwealth* v. *Botelho, supra* at 868."

Whether the identification procedure employed in this case was unnecessarily or impermissibly suggestive turns, in large measure, on whether the police had good reason for using a one-on-one identification procedure. See *Commonwealth* v. *Austin*, 421 Mass. 357, 361-362 (1995), and cases and authority therein cited.

There was ample justification for the one-on-one showup. It was late at night; there were at least three assailants; one of the assailants held an Uzi machine gun to Uda's head; the assailants threatened to kill Uda; upon seeing the arrival of the police, the assailants ran in different directions; and the defendant was found hiding in bushes in the area of the robbery. Although Uda and Thomas viewed the defendant in the presence of each other, a police officer had been positioned to make certain that neither witness influenced the other in making their respective identifications of the defendant.[2] Additionally, the showup was conducted within ninety minutes of the robbery and under the same lighting conditions, that is, the showup took place in the parking lot. See *Commonwealth* v. *Moynihan*, 376 Mass. 468, 476 (1978). Based upon these considerations, see generally *Commonwealth* v. *Coy*, 10 Mass. App. Ct. 367, 371-372 (1980), we conclude that the trial judge was warranted in determining that the defendant had failed to show by a preponderance of the evidence that the defendant was subjected to a showup that was so unnecessarily suggestive as to be conducive to a mistaken identification. See *Commonwealth* v. *Andrews*, 427 Mass. 434, 438 (1998).

Our conclusion makes it unnecessary for us to consider whether the Commonwealth sustained its burden of showing that the identifications had an independent source. *Id.* at 439. Even were we to conclude that the defendant had met his initial

---

[2] That Uda and Thomas must have suspected that they were being presented with males whom the police believed to be Uda's assailants is a fact inherent in most one-on-one showups, which are nonetheless permissible if otherwise justified.

burden of proof, the result would be no different. Thomas testified that he had excellent eyesight, that he made his observations from a vantage point of no more than thirty feet, that the parking lot was well-lighted, and that the interior light of Uda's vehicle also provided illumination of the events taking place within Uda's automobile. Uda testified that the lighting in the parking lot as well as his headlights gave him a good view of the men who stood in front of his car to block his egress from the lot. Additionally, the fact that he managed to keep the interior light of his vehicle on made it possible for him to view the suspects throughout his ordeal that lasted, as he estimated, five or ten minutes.

3. *The jury instructions.* There are two attacks upon the trial judge's instructions to the jury, the first of which concerns the identification of the defendant. The defendant requested that the jury be instructed that they could "take into account that any identification that was made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to a witness." See *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 310-311 (1979). The trial judge did not give the instruction, and the defendant did not take an objection at the conclusion of the charge. He now claims that the omission of his requested instruction was error rising to the level of a substantial miscarriage of justice.

On the evidence presented, we think the preferable course of action would have been to give the requested instruction. Although we are mindful of the fact that "strict adherence to the instruction suggested in the *Rodriguez* opinion is not required," *Commonwealth* v. *Hallet,* 427 Mass. 552, 558 (1998), we will assume for purposes of decision that the trial judge erred in not delivering the requested instruction. The question then becomes whether the assumed error requires reversal of the defendant's conviction. We set out the given identification instruction:

> "[I]dentifying a witness must be free from doubt as to the correctness of his identification, but you must be satisfied beyond a reasonable doubt from oral evidence of the ac-

curacy of the identification of the defendant before you convict him of any crime. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime or crimes then you must find the defendant not guilty. In determining the reliability of the identification you must consider whether the witness had the capacity and adequate opportunity to observe the alleged defendant. Whether the witness had an adequate opportunity to observe the defendant at the time of the offense, when he testified how long or short [a] period of time was available to make the observation. How far the witness was to the person who committed the crime. What were the lighting conditions. Whether the witness had ever had an occasion or an opportunity to see that person prior. As to the identification beyond a reasonable doubt, you should consider whether the identification order and circumstances in order to protect the defendant and whether they were suggestive. You may also consider the length of time the witness observed the crime and any suspects and the opportunity for later identification. You will also — may consider the possibility that a person may make in identifying the person maybe made by an honest mistake. In this case the witnesses were questioned by Mr. Snell who was a policeman was directed to whether or no[t] they conducted all the requests and procedures. Now, if you find based on all the evidence that the policemen did not follow the procedures indicated in a case of this kind then you may consider that along with all the other evidence in determining the defendant's guilt."

Viewing the identification instruction as a whole, we conclude that it was sufficient to apprise the jury of the possibility of a mistaken identification, what circumstances they should consider in determining the weight to be given the identification testimony, and, most importantly, the Commonwealth's burden of proof, beyond a reasonable doubt, which was to control consideration of the issue. See *Commonwealth* v. *Walker*, 421 Mass. 90, 100-101 (1995). Compare the circumstances presented and the instructions given in *Commonwealth* v. *Hallet*, 427 Mass. at 557 & n.2. Put otherwise, even assuming that it was error to omit the defendant's requested jury instruction from his charge, we conclude that the assumed error did not create a substantial risk of a miscarriage of justice.

We can dispose in short order the defendant's second attack against the jury instructions, that is, that the trial judge's charge on assault and battery with a dangerous weapon was so "garbled" as to fail to describe adequately the battery element of that offense and that this failure created a substantial risk of a miscarriage of justice. The defendant did not object at the end of the instructions, and again, we assume rather than decide that the instruction in issue was erroneous and consider only whether the claimed error created a substantial risk of a miscarriage of justice.

We conclude that reversal of the defendant's conviction on the basis of this portion of the trial judge's charge is not required for the reason that there was never any real question about Uda's testimony that one of his assailants used the Uzi to force his head to the windshield of his car. Rather, the real issue in controversy was whether the defendant was one of Uda's assailants. "Incorrect instructions on an element of a crime have not created a substantial risk of a miscarriage of justice where the defense strategy at trial was incorrect identification, *Commonwealth* v. *Mezzanotti*, 26 Mass. App. Ct. 522, 529 (1998), or self-defense, *Commonwealth* v. *Medina*, 43 Mass. App. Ct. 534, 536 (1997)." *Commonwealth* v. *Jenkins*, 47 Mass. App. Ct. 286, 292 (1999). See *Commonwealth* v. *Puleio*, 394 Mass. 101, 109 (1985); *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986).

4. *The prosecutor's closing argument.* It is the defendant's claim that there were numerous improprieties in the prosecutor's closing argument that gave rise to a substantial risk of a miscarriage of justice, requiring reversal of his convictions. Although the prosecutor made statements that we think better left unsaid, see *Commonwealth* v. *Fletcher*, 52 Mass. App. Ct. 166, 173-174 (2001), we think those statements sufficiently comparable to those reviewed in *Commonwealth* v. *Lyons*, 426 Mass. 466, 471 (1998), wherein it was held:

> "Although not dispositive, we consider the fact that the defendant did not object to the statements at trial as 'some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not

unfairly prejudicial.' *Commonwealth* v. *Mello*, 420 Mass. 375, 380 (1995), quoting *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375 (1989). We review the prosecutor's remarks in the context of his entire closing argument, the judge's instructions to the jury, and the evidence produced at trial. See *Commonwealth* v. *Mello, supra*; *Commonwealth* v. *Costa*, 414 Mass. 618, 629 (1993); *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990)."

After consideration of each of the claims therein presented, most of which are similar, if not identical, to those raised by the defendant on appeal, the court wrote that "[i]n light of the prosecutor's entire closing argument, the judge's instructions to the jury, and the evidence of the defendant's guilt, we conclude the summation did not create a substantial [risk] of a miscarriage of justice." *Commonwealth* v. *Lyons*, 426 Mass. at 474. See *Commonwealth* v. *Donovan*, 422 Mass. 349, 358 (1996) ("Even if the prosecutor's arguments cross the line, the judge's instructions avoided substantial prejudice to the defendant"). The defendant presents us with no reason for departing from the conclusion reached and discussed in *Commonwealth* v. *Lyons*, 426 Mass. at 474.

5. *The motion for a new trial.* Trial counsel was ineffective, the defendant claims, because he never interviewed the physician who treated his dog bite wound. He alleges that counsel was aware of this fact from Snell's police report, a copy of which was attached to the motion,[3] and that the physician's affidavit, also attached to the motion, shows that his testimony, had it been obtained, would have supported his assertion that he neither understood nor spoke English.[4]

In endorsing his denial of the motion, the trial judge wrote

---

[3]In his report, Snell related: "I transport[ed] [the defendant] to Symmes Hospital for treatment of a dog bite from Max. While at the hospital [the defendant] claimed that he didn't speak English, I explained to him that the doctor's questions could save his life. [The defendant] then said, '[O]k, I understand what he said to me.' [The defendant] answered the doctor's questions about medications and treatment of the wounds." Snell's testimony at the defendant's trial was consistent with his report.

[4]The key paragraph in the physician's affidavit reads: "I posed questions to [the defendant] and gave directions in English, and he gave no response whatsoever. He never indicated that he understood what I was saying and never answered in any language." The physician also stated that the only attorney who contacted him about this matter was the defendant's appellate

that he refused to give any weight to the affidavit of the physician, given three years after the fact, in which he purported to remember what he said to the defendant and what, if anything, the defendant said to him. He further stated that he found it "unlikely" that trial counsel had not asked either the defendant or the physician about this matter. The credibility, weight, and impact of the affidavits in support of the motion were matters left to the discretion of the trial judge. See *Commonwealth* v. *Pingaro*, 44 Mass. App. Ct. 41, 48 (1997), and cases therein cited.

Even were we to conclude that the trial judge erred in refusing to accept the statements set out in the affidavits of the physician and trial counsel, our conclusion would be no different. There was an interpreter for the defendant at his trial. On that basis alone, the defendant was able to convey to the jury his assertion that he neither could speak nor understand English. "If it were thought that the deficiency in pre-trial preparation was not in fact made good, still we think the defendant could make no headway in the absence of a showing that the fault probably resulted in forfeiture of a substantial defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 98 (1974). We see no error in the denial of the motion.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

counsel. The latter assertion was supported by an affidavit from trial counsel in which he acknowledged that he had been provided, through discovery, with Snell's police report, that he never contacted the physician, and that he could not "recall . . . whether [he] ever considered contacting the doctor or, if [he] did consider doing so, any reason [he] may have had for not contacting him."