NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11720

COMMONWEALTH  vs.  JASON BARBOSA.


        Suffolk.    February 10, 2017. - August 25, 2017.

        Present:  Gants, C.J., Hines, Lowy, & Budd, JJ.[1]


Homicide.  Joint Enterprise.  Evidence, Joint venturer, Expert
    opinion, Hearsay, Spontaneous utterance, Opinion.
    Practice, Criminal, Capital case, Opening statement,
    Argument by prosecutor, Assistance of counsel, Indictment.



    Indictments found and returned in the Superior Court
Department on May 23, 2012.

    A motion to dismiss was heard by Charles J. Hely, J., and
the case was tried before Christine M. McEvoy, J.


    Patricia A. DeJuneas for the defendant.
    Teresa K. Anderson, Assistant District Attorney (Patrick M.
Haggan, Assistant District Attorney, also present) for the
Commonwealth.


    HINES, J.  On February 23, 2012, Anthony Depina was shot

and killed outside a bar in the Roxbury section of Boston.  The

defendant, Jason Barbosa, was indicted on the charges of murder

_____

    [1] Justice Hines participated in the deliberation on this
case and authored this opinion prior to her retirement.

in the first degree and unlawful possession of a firearm as an armed career criminal[2]. The Commonwealth proceeded against him on the theory of deliberate premeditation. Specifically, the Commonwealth's theory at trial was that the shooting was committed as part of a joint venture wherein the defendant was a knowing participant, either as the shooter or as an accomplice. The jury convicted the defendant of murder in the first degree, and did not specify whether they found the defendant guilty as a principal or as a joint venturer.

On appeal, the defendant argues that (1) the Commonwealth presented insufficient evidence to support his conviction as both the shooter and as a knowing participant with shared intent to kill; (2) the judge abused her discretion in admitting prejudicial gang evidence; (3) the prosecutor's opening statement and closing argument were improper; (4) the judge allowed inadmissible statements, which unfairly bolstered the Commonwealth's theory of gang retaliation and allowed improper interpretive testimony; (5) trial counsel provided ineffective assistance of counsel; and (6) the motion judge erroneously denied the defendant's motion to dismiss the indictments. We affirm the conviction and decline to grant relief pursuant to G. L. c. 278, § 33E.

---

[2] Prior to trial, the Commonwealth entered a nolle prosequi as to the firearm charge.

Background.  We recite the relevant facts the jury could have found.  We reserve certain details of the evidence presented to the grand jury for later discussion of the defendant's motion to dismiss.  The defendant and the victim had ties to rival Cape Verdean gangs.  The defendant was a member of the Woodward Avenue gang, and the victim was associated with the Wendover Street gang.  Although the groups were aligned at one point, around 2005, the relationship between them deteriorated and they became involved in an ongoing feud active through February, 2012, when the victim was murdered.

On December 24, 2011, the defendant and two other members of the Woodward Avenue gang, Kenneth Lopes and Manuel Montrond, were involved in an altercation with several members of the Wendover Street gang, including the gang's leader, at a gasoline station in Boston.  The defendant and Lopes were injured during the altercation, but neither cooperated with the police investigation.

Two months later, on February 23, 2012, around 9:30 P.M., the defendant, who was on probation and wearing a global positioning system (GPS) tracking bracelet, and Montrond arrived at a bar near the intersection of Burrell Street and Norfolk Avenue in Roxbury in a black Cadillac CTS rented by Montrond. Minutes later, Lopes alighted from a different vehicle. Montrond signaled Lopes by flashing his headlights twice.  The

three men entered the bar.[3]  The actions of the defendant, Montrond, and Lopes were captured by the bar's eleven video surveillance cameras.  The cameras inside the bar were continuously recording, while the cameras outside the bar were motion-activated.  Analysis of the time stamp on the video surveillance and the defendant's GPS data[4] revealed that the time stamp on the video recordings was approximately four minutes and thirty seconds fast.  Other actions that were relevant were tracked by the coordinates of the GPS and involved streets that were near the bar.

Once inside the bar, the men socialized with the defendant's ex-girl friend, and her cousin.  A few minutes after the men arrived, Montrond left the bar and went outside to sit in the Cadillac.  The victim walked by and waved at Montrond on his way into the bar.

Although the bar is located in territory claimed by Woodward Avenue gang members, members of the Wendover Street gang, including the victim, also patronized the bar.  The defendant and the victim grew up together and were friends when

---

[3] Montrond and Lopes were mentioned by name at trial as possible joint venturers.  However, it appears that neither man was ever charged in connection with the murder.

[4] A representative from the Department of Probation, which administered the defendant's GPS monitoring, testified that the time stamp on the GPS data points use the atomic clock, which is more accurate than the time stamp from the bar's video surveillance footage.

they were younger, but their relationship changed when the defendant, who had been affiliated with the Wendover Street gang, began to associate with members of the Woodward Avenue gang.  Despite the change in their relationship, when the victim arrived at the bar just before 10 P.M. with Maria Teixeira, the victim greeted the defendant with a handshake and then walked to the end of the bar.

The defendant and the victim each left the bar at different times and returned without incident, including when the defendant was in Montrond's vehicle while the victim walked by.

At one point, however, the defendant left the bar and drove around, returning to the area of the bar at around 10:20 P.M., and then drove to Woodward Avenue.  The defendant returned to Burrell Street and walked toward the bar.  The victim and Teixeira left the bar just before 10:30 P.M. and stopped by the victim's home before leaving again.  Meanwhile, the defendant appeared to be searching the area; he walked down Burrell Street, where the victim's vehicle had been parked, and then turned around, returning to his vehicle and driving to Albion Street, where Teixeira lived.  At around 10:45 P.M., the defendant returned to the area of Burrell Street and Norfolk Avenue, followed by Montrond's rented black Cadillac.  The defendant alighted from a small, dark-colored sport utility vehicle (SUV) and went inside the bar.  A black Cadillac

followed the vehicle the defendant had been in.  Once inside the bar, the defendant looked around the interior of the establishment, searching the bar area, pool room, lounge, and bathroom before leaving less than a minute after arriving.

At around 11 P.M., the victim and Teixeira returned to the area of Burrell Street and Norfolk Avenue near the bar.  The victim previously had made plans with Joseph Rosa, a member of the Wendover Street gang, and two women to meet at the bar for drinks.  The victim and Teixeira arrived in the victim's vehicle and parked on Burrell Street, with the driver's side of the vehicle next to the sidewalk, near a dark alley.  Although the plan was to go have drinks at the bar, the people the victim was meeting decided not to go inside.  Instead, the victim and Teixeira walked over to Rosa's vehicle and spoke with the occupants through the passenger-side window while standing on the sidewalk.  While the group was talking, the defendant pulled up driving a small black SUV, and stopped alongside Rosa's vehicle.  The defendant said something to the effect of, "You don't belong here."  The victim said something back to the defendant, and the defendant quickly drove away, followed by the black Cadillac.

As a result of the interaction with the defendant, Rosa and one of the women encouraged the victim to leave, but he refused, insisting that he was a "tough kid" and that no one could tell

him where he can go. Rosa and the two women left. The victim and Teixeira went back to the bar, intending to have a drink. Teixeira went inside the bar to use the bathroom; the victim stayed outside and smoked a cigarette. The defendant drove past the bar slowly in the small black SUV. As the defendant drove by, the victim stood by the front door of the bar and pointed at the defendant.

Seconds later, the victim went inside the bar; he first went to the bathroom and then waited for Teixeira at the bar, declining a drink. When Teixeira joined him at the bar, he told her that he had changed his mind and wanted to leave. The victim did not tell Teixeira why he had changed his mind and appeared normal, but a little "mad." As the victim and Teixeira left the bar and walked to his vehicle, they had a conversation about the earlier interaction with the defendant at Rosa's vehicle. As Teixeira and the victim approached his vehicle, headlights from a vehicle up the street flashed four times. The victim looked toward the street. Teixeira heard him use the defendant's nickname and say, "Are you for real, Little J?" Teixeira looked down the street and saw an individual walking in the middle of the street, but she could not see the individual's face.[5] Immediately thereafter, another individual fired multiple

---

[5] On cross-examination, Teixeira noted that the individual appeared to be male, with short braids. The defendant had

gunshots at the victim from the nearby alley.[6]  The victim was shot in the head and torso, and he fell to the ground, face up, in between the driver's side door of his vehicle and the curb.

At or about the time of the shooting, which was approximately 11:10:43 P.M., the defendant's GPS data points[7] established that at 11:10:05 P.M., he was located on Burrell Street, near Batchelder Street, traveling zero miles per hour. At 11:10:36 P.M., the defendant was on Burrell Street headed toward Norfolk Avenue, near the bar, traveling two miles per hour.  There was a missing data point directly after the murder, which should have recorded at 11:11:06 P.M.  Seconds after the shooting, the dark-colored SUV drove down Burrell Street, turned right on Norfolk Avenue, and then took another right onto Marshfield Street.[8]  At that time, 11:11:35 P.M., the defendant's GPS coordinates show him traveling on Marshfield Street at

_____

short, braided hair.  She also acknowledged that she did not see a gun in the individual's hands.

[6] Teixeira testified that she did not see another individual besides the person in the middle of the street and that the shots rang out within a second of the victim's statement, "Are you for real, Little J."

[7] A GPS data point with the defendant's location was to be recorded every thirty seconds and included information about his location and speed and the strength of the GPS signal; the location information is accurate to within fifteen feet.

[8] A neighbor who lived on Norfolk Street near the bar testified that he heard gunshots at around 11 P.M. that night and then saw a black "SUV-type car" driving "way too fast" on Norfolk Avenue.

thirty-eight miles per hour.  Minutes after the shooting, the defendant returned to a house on Woodward Avenue.[9]

After Teixeira heard the gunshots, she ran across the street and back inside the bar.  Although Teixeira saw the victim go down, she did not realize he had been shot when she fled the gunfire.  As she re-entered the bar, Teixeira kept saying "shots fired, shots fired."  Eventually, she went back outside to discover the victim's body, lying face-up between his vehicle and the curb.  The bartender telephoned 911.

When police officers arrived at around 11:15 P.M., Teixeira was hysterical.  Officers had to physically restrain her as well as hold her upright because she was distraught, screaming, and crying.  She was transported to Boston police headquarters.  On the way, she stated, "They're going to kill me for this."  In the interview room at the police station, she was still so emotionally upset that she became physically ill.  Shortly thereafter, she was asked some questions.  She stated, "These people want to kill people because of the fucking street."  After she identified the victim, Teixeira announced, "I'm going to die for this.  I'm going to tell you anyway."  In response to the detective's question "Who shot?," Teixeira replied, "Little J, Jason."

---

[9] The house was a "clubhouse" and hang out spot for Woodward Avenue gang members.

The victim suffered gunshots wounds to the head and torso, both of which were independently fatal and caused his death within seconds. Although ballistics evidence was recovered from the victim's body and the crime scene, analysis was inconclusive as to whether the bullet fragments were fired from the same weapon. The shell casings were identified as nine millimeter Lugar caliber and were fired from the same semiautomatic pistol. No firearm was recovered in connection with the victim's shooting.

As part of the investigation, detectives sought to identify and locate the Cadillac that Montrond had rented and the small black SUV the defendant was driving on the night of the shooting. The small black SUV was never located. Although the rental contract on the Cadillac was set to end on February 29, 2012, Montrond returned the vehicle the day after the shooting, canceled the contract, and established a new rental contract for a 2012 Buick Lacrosse.[10]

Two days after the shooting, the defendant and Montrond were stopped by police, who seized the defendant's cellular telephone. Pursuant to a search warrant, detectives searched

---

[10] A representative of the rental company testified that this situation was unusual. Generally where a customer is unhappy with a rental car, the company merely switches out that vehicle without closing the rental contract and notes the customer-service issue, rather than establish a new rental contract. The representative also confirmed that there were no mechanical issues or damage to the Cadillac.

the defendant's cellular telephone and telephone records.  The
telephone records established that approximately two minutes
before the shooting, the defendant telephoned one of the leaders
of the Woodward Avenue gang, and that approximately one minute
after the shooting, at 11:12 P.M., the defendant made a
telephone call to another leader of the Woodward Avenue gang.
Between 11:13 P.M. and 11:20 P.M., the defendant received a
telephone call from Lopes, made an outgoing call to Montrond,
and received another incoming call from Lopes.

The defendant moved for a required finding of not guilty at
the close of the Commonwealth's case, which was denied.  The
judge also denied the defendant's renewed motion for a required
finding of not guilty at the close of all evidence.

Discussion. 1. Sufficiency of the evidence.  The
defendant challenges the sufficiency of the evidence for his
conviction.  Specifically, he argues that because the jury
returned a general verdict, and the Commonwealth proceeded on
mutually exclusive theories of joint venture liability, his
conviction must be reversed where the Commonwealth failed to
present sufficient evidence to prove that he was both the
shooter and a knowing participant with the shared intent to
kill, beyond a reasonable doubt.  In support of his argument,
the defendant's relies on Commonwealth v. Akara, 465 Mass. 245,
254-256 (2013), for the proposition that where the Commonwealth

proceeds on mutually exclusive theories of joint venture, it must prove the sufficiency of the evidence as to each theory. We disagree.

The rule we apply in analyzing the sufficiency of the evidence was articulated in Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009):

> "we will examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime, rather than examine the sufficiency of the evidence separately as to principal and joint venture liability."

As we noted in Akara, 465 Mass. at 254, the circumstances of that case were "unusual," such that we departed from our traditional analysis under Zanetti, supra. In Akara, supra at 254-255, two defendants were tried jointly, but the evidence presented did not support the conclusion that both defendants could have fired the weapon. Paradoxically, the strongest evidence against each defendant was that he knowingly participated in the charged crime by pulling the trigger. Id. at 254. Given the unique factual circumstances of the case, this court considered "whether the evidence, . . . in the light most favorable to the Commonwealth, support[ed] the conclusion that each defendant, although not the shooter, participated in and shared the requisite intent to commit the crime" to ensure that each conviction was legally supportable. Id.

This case, however, does not call for such a departure from Zanetti.  Although the defendant correctly notes that here, as in Akara, the Commonwealth proceeded on mutually exclusive theories of joint venture (e.g., the defendant as the shooter and as a coventurer), there was no codefendant upon whose actions the defendant's conviction relies.  See Akara, 465 Mass. at 254.  Thus, the Commonwealth's burden here is to demonstrate that the evidence, viewed in the light most favorable to the Commonwealth, supported the conclusion that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense," Zanetti, 454 Mass. at 468, rather than prove each "theory" separately.

"In order to have committed murder in the first degree with deliberate premeditation, a defendant must have had or shared an 'intent to kill or cause death,' [Commonwealth v. Norris, 462 Mass. 131, 139 (2012)], which was the 'product of "cool reflection."'"  Commonwealth v. Tavares, 471 Mass. 430, 434-435 (2015), quoting Zanetti, 454 Mass. at 455.  "In evaluating whether the evidence at trial was sufficient to support these elements, we 'view the evidence presented in the Commonwealth's case-in-chief in the light most favorable to the Commonwealth and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

Commonwealth v. Gonzalez, 475 Mass. 396, 407 (2016), quoting Commonwealth v. Simpkins, 470 Mass. 458, 461 (2015). "[C]ircumstantial evidence is sufficient to establish guilt beyond a reasonable doubt[, and t]o the extent that conflicting inferences may be drawn from the evidence, it is for the jury to decide which version to credit" (citation omitted). Commonwealth v. Miranda, 458 Mass. 100, 113 (2010), cert. denied, 565 U.S. 1013 (2011), S.C., 474 Mass. 1008 (2016).

From the evidence, a reasonable jury could have found that the defendant was motivated by anger at the ongoing feud between the Woodward Avenue gang and the Wendover Street gang, especially after the altercation at the gasoline station between the defendant, Lopes, and Montrond, and members of the Wendover Street gang, which occurred two months prior to the murder, resulted in the injury to the defendant and Lopes. The jury also could have found that the defendant's threat, "You don't belong here," was evidence of his motivation to kill because the victim, an associate of the Wendover Street gang, was present in Woodward Avenue gang "territory."

Based on the surveillance footage from the interior and exterior of the bar and the defendant's GPS data, the jury also could have found that after the defendant left the bar the first time, he began stalking the victim, thus demonstrating his knowing participation and shared intent to commit the

premeditated murder. See Zanetti, 454 Mass. at 455. Specifically, the defendant traveled to the area near the bar around 10:20 P.M., before returning to Woodward Avenue. Approximately ten minutes later, after the victim and Teixeira left the bar, the defendant walked to Burrell Street where the victim had been parked and then turned around. Thereafter, the defendant drove to Albion Street, where Teixeira lived, and later returned to the bar and searched for the victim at 10:45 P.M. At around 11 P.M., the defendant threatened the victim, stating, "You don't belong here," and approximately eight minutes later, he slowly drove by the bar where the victim was smoking a cigarette outside. This interaction made the victim change his plan of getting a drink at the bar, and instead he insisted that he and Teixeira leave the bar. Finally, a vehicle's headlights flashed four times signaling the victim's arrival at his vehicle.

The inference of the defendant's participation in the joint venture is even stronger based on the victim's statement as he approached his vehicle, "Are you for real, Little J?," and Teixeira's observation of a man in the middle of the street with short braided hair, which matched the description of the defendant. Also, the defendant's GPS data places him walking on Burrell Street, near the victim's vehicle, at or about the time

of the murder.  Seconds later, gunshots rang out from the alley, killing the victim.

The defendant's flight from the scene less than a minute after the shooting, traveling thirty-eight miles per hour on Marshfield Street and eventually arriving on Woodward Avenue, and telephone calls with his suspected coventurers immediately before the shooting and in the thirty minutes after, allow the reasonable inference of the defendant's participation in and shared intent to commit the murder.  See Miranda, 458 Mass. at 113; Zanetti, 454 Mass. at 455.

Therefore, the jury could reasonably have found that the defendant knowingly participated in the premeditated murder, with the requisite shared intent.  See Zanetti, supra at 468.

2.  Gang opinion testimony.  The judge conducted a voir dire to assess -- and to allow the defendant to challenge -- the foundation for the opinions of the Commonwealth's gang expert, Detective Martin O'Malley.  At trial, the jury heard about O'Malley's background and experience with Cape Verdean gangs. The defendant contends that the judge abused her discretion in allowing this testimony, both because O'Malley was not qualified and because his testimony was based on inadmissible hearsay. The Commonwealth argues that the evidence was properly admitted to prove motive, and was based on the qualified expert's personal knowledge.  There was no error.

Expert opinion testimony "must rest on a proper basis, else inadmissible evidence might enter in the guise of expert opinion." Commonwealth v. Waite, 422 Mass. 792, 803 (1996). Proper bases include facts within the witness's direct personal knowledge, or unadmitted but independently admissible evidence. See Mass. G. Evid. § 703 (2017); Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986). Here, O'Malley's extensive experience with Cape Verdean gangs generally, and with the victim and defendant specifically, qualified him as an expert and provided direct personal knowledge for the testimony he offered. O'Malley served as lead investigator from the Boston police department in an approximately two-year joint investigation with the Federal Bureau of Investigation into Woodward Avenue gang members, which concluded in January, 2013. Before that, he was a patrolman in the Dorchester section of Boston for seven years, and assigned to the youth violence strike force gang unit for another two. In both capacities, O'Malley logged countless conversations with Cape Verdean residents -- including concerned citizens, cultivated informants, and admitted gang members -- and from these interactions, he made determinations of gang affiliation. He testified to individual affiliations within the Woodward Avenue and Wendover Street gangs; to the territorial reach of each gang; and to the history of the gangs as aligned until about

2005, when a split gave rise to a feud active at the time of the victim's death.  O'Malley knew the victim since about 2005, and had observed him with Wendover Street gang associates and at the addresses of the gang's headquarters on several occasions.  He was similarly familiar with the defendant, whom he had observed wearing Woodward Avenue gang colors and in the presence of Woodward Avenue gang leaders on multiple occasions.  O'Malley also testified that the defendant had left the Wendover Street gang for the Woodward Avenue gang in 2006 and that, as a result, animosity remained between the defendant and a leader of the Wendover Street gang.

O'Malley's testimony, based on his personal knowledge, was admissible.  Mass. G. Evid. § 703.  See Commonwealth v. Smith, 450 Mass. 395, 399, cert. denied, 555 U.S. 893 (2008) (rejecting hearsay challenge to officer's gang opinion testimony based on "use of informants, street sources of information, the school police, teachers, probation officers, enemies," where officer had personal familiarity with victim, defendant, and their respective gangs).

The Commonwealth's theory was that there was a joint venture motivated by this ongoing rivalry between the Woodward Avenue and Wendover Street gangs.  Evidence of the defendant's affiliation with the Woodward Avenue gang was probative of motive, and provided necessary context for the defendant's

statement to the victim ("You don't belong here").  See Commonwealth v. Correa, 437 Mass. 197, 201 (2002) ("[W]here evidence of gang affiliation is relevant to the defendant's motive, it is within the discretion of the judge to weigh the probative value of the evidence against its prejudicial effect").

Moreover, the judge took precautions to minimize any prejudicial impact of the gang opinion testimony.  She conducted individual voir dire with each juror, using three agreed-upon questions to confirm the juror's capacity to consider the evidence only for its limited purpose.  Each time the evidence was introduced, it was accompanied by a thorough limiting instruction, which was repeated in the final charge.  Especially where the judge carefully cabined properly admitted testimony with limiting instructions, voir dire, and exclusion of any references to prior acts of gang-related violence, admitting that testimony in evidence was not an error.  See Smith, 450 Mass. at 400, and cases cited.

3.  Prosecutor's opening statement and closing argument.  The defendant argues that the prosecutor's opening statement and closing argument, to which the defendant did not object, were improper.  "Although not dispositive, we consider the fact that the defendant did not object to the statements at trial as 'some indication that the tone [and] manner . . . of the now

challenged aspects of the prosecutor's argument were not unfairly prejudicial.'" Commonwealth v. Lyons, 426 Mass. 466, 471 (1998), quoting Commonwealth v. Mello, 420 Mass. 375, 380 (1995). We conclude that there was no error.

"The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence." Commonwealth v. Croken, 432 Mass. 266, 268 (2000), quoting Commonwealth v. Fazio, 375 Mass. 451, 454 (1978). "[A] claim of improper [opening statement] by the prosecutor must be judged in light of the entire [statement], the judge's instructions to the jury, and the evidence actually introduced at trial." Commonwealth v. Jones, 439 Mass. 249, 260-261 (2003), quoting Commonwealth v. Thomas, 429 Mass. 146, 158 (1999). Here, the defendant argues that the prosecutor improperly appealed to the jury's emotions by reminding them that they saw where the shooter emerged from the alley during the view of the crime scene, and by using phrases such as "killing team" and "stalking and hunting," during his opening statement. The prosecutor's statements were not improper, as they were merely "enthusiastic rhetoric." See Commonwealth v. Simpson, 434 Mass. 570, 586 (2001). Moreover, "to the degree the recitation of the evidence was inflammatory, that was inherent in the odious . . . nature of the crime[] committed" (citation omitted). Commonwealth v. Johnson, 429

Mass. 745, 749 (1999). The jury were properly instructed before the opening statements, and in the final charge, that the statements were not evidence.

Similarly, "[c]losing arguments must be viewed 'in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial.'" Commonwealth v. Braley, 449 Mass. 316, 328-329 (2007), quoting Commonwealth v. Colon-Cruz, 408 Mass. 533, 553 (1990). The defendant claims that the prosecutor improperly appealed to the jury's emotions when he encouraged the jurors to use their recollections of the view to evaluate the evidence. He also claims that the prosecutor used improper forceful rhetoric in describing the victim's murder and the defendant's actions and that the prosecutor engaged in misconduct when he asked the jurors to hold the defendant accountable for his actions.

The prosecutor properly encouraged the jury to use their observations from the view to evaluate the evidence and aid in reaching their verdict. See Commonwealth v. Corliss, 470 Mass. 443, 448 (2015), quoting Commonwealth v. Gomes, 459 Mass. 194, 199 (2011) ("[a]lthough what is seen on the view may be used by the jury in reaching their verdict, in a 'strict and narrow sense a view may be thought not to be evidence'"). Similarly, the prosecutor's forceful rhetoric was based on the evidence without focusing on any unnecessarily emotional or inflammatory

aspects of the evidence.  See Lyons, 426 Mass. at 472.
Moreover, the prosecutor's description of the victim's murder
was based on the evidence and was relevant to establish the
nature of the crime.  See Commonwealth v. Sanchez, 405 Mass.
369, 376 (1989), quoting Commonwealth v. Kozec, 399 Mass. 514,
521 (1987) ("Although this line of argument may evoke sympathy
for the victim[], the argument went to the issues in the case
and was 'based on what the jury saw and heard'").  The judge
instructed the jury prior to the arguments and in the final
charge that closing statements were not evidence, and
specifically instructed the jury to "not decide this case in any
way based on sympathy towards the victim or the victim's family
or any sympathy towards the defendant."  The prosecutor's
statement reminding the jury that the victim's murder occurred
nearly two years prior to the trial and that the time for the
defendant's accountability is now, was not improper.  Although
the statement regarding the defendant's accountability was
better left unsaid, "[t]he prosecutor's remarks were
characteristic of 'enthusiastic rhetoric, strong advocacy, and
excusable hyperbole,' and did not cross the line between fair
and improper argument."  Lyons, supra, quoting Commonwealth v.
Sanna, 424 Mass. 92, 107 (1997).  Contrast Commonwealth v.
Torres, 437 Mass. 460, 464-465 (2002) (improper argument where
prosecutor asked jury to "answer the call for justice and hold

[the defendant] accountable for what he did").  The prosecutor's statement "falls within the category of permissible rhetoric and . . . there was no error."  Commonwealth v. Mejia, 463 Mass. 243, 255 (2012).

The defendant claims that the prosecutor also improperly encouraged the jurors to use evidence that Montrond returned the rented Cadillac the day after the murder as evidence of the defendant's participation in the joint venture.  We do not agree.  The prosecutor was entitled to argue inferences from the evidence that are favorable to the Commonwealth's case.  See Lyons, 426 Mass. at 472.  The jury reasonably could infer that in order to cover up his participation in the joint venture, Montrond returned the Cadillac the day after the murder, before the end of his rental contract.  The jury could further infer the defendant's knowing participation based on his presence in the Cadillac that evening and the surveillance footage depicting the Cadillac following the defendant's vehicle on multiple occasions that evening.  See id.

Finally, the defendant's argument that the prosecutor improperly suggested that the jury's job was "easier" because they could find the defendant guilty of joint venture without determining whether he was the shooter or a coventurer is without merit.  The prosecutor correctly stated the law of joint venture and the Commonwealth's burden.  See Commonwealth v.

Deane, 458 Mass. 43, 50-51 (2010) ("the Commonwealth is not required to prove exactly how a joint venturer participated in the murder[], . . . or which of the [coventurers] did the actual killing" [citation omitted]).

4. Evidentiary rulings. The defendant argues that the judge committed reversible error in (1) allowing inadmissible statements that unfairly bolstered the Commonwealth's theory of gang retaliation and (2) allowing improper "interpretive" testimony from the lead homicide detective. We address these arguments in turn.

a. Statements by the victim's friends. The defendant challenges the admission of statements from Rosa and one of the women who were with him that night describing their concern for the victim after the defendant's statement, "You don't belong here." The admission of the statements was not improper, as they were not admitted for their truth and, thus, not hearsay. See Mass. G. Evid. § 801 (2017). The judge noted that the witnesses' statements were admissible "to put in context" the victim's statement of intent to go inside the bar and have a drink. There was no error or abuse of discretion in admitting these statements. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

b. Teixeira's statements. The defendant challenges three of Teixeira's statements, made after she discovered that the

victim had been murdered, admitted under the excited or spontaneous utterance hearsay exception through the testimony of a police officer. As Teixeira was being transported to Boston police headquarters, she exclaimed, "They're going to kill me for this." Thereafter, while she was waiting to be interviewed by homicide detectives, Teixeira stated, "These people want to kill people because of the fucking street." And during her interview with homicide detectives, Teixeira said, "I'm going to die for this." There was no error.

A statement is "[a] spontaneous utterance if (A) there is an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer, and (B) the declarant's statement was a spontaneous reaction to the occurrence or event and not the result of reflective thought." Mass. G. Evid. § 803(2) (2017). See Commonwealth v. Santiago, 437 Mass. 620, 623 (2002). "[T]here can be no definite and fixed time limit [between the incident and the statement]. Each case must depend upon its own circumstances." Mass. G. Evid. § 803(2) note, quoting Commonwealth v. McLaughlin, 364 Mass. 211, 223 (1973). "[T]he nexus between the statement and the event that produced it is but one of many factors to consider in determining whether the declarant was, in fact, under the sway of the exciting event when she made the statement." Santiago, supra at 625. A trial

judge's determination that an utterance meets the test of admissibility should be given deference and "only in clear cases . . . of an improper exercise of discretion should [the judge's] ruling be revised" (citation omitted). McLaughlin, supra.

Here, the Commonwealth used Teixeira's statements to support its theory that the victim's murder was motivated by the ongoing feud between the Wendover Street and Woodward Avenue gangs and by retaliation for the defendant's and Lopes's injuries from the December, 2011, altercation with a leader of the Wendover Street gang. Her statements occurred after she discovered the body of the victim, whom she had been seeing romantically, after he had been shot to death. Teixeira was hysterical. Prior to her first challenged statement, she was found by police lying on the sidewalk screaming and crying. Officers had to physically restrain Teixeira from returning to the victim's body and hold her up so that she did not collapse, as she was unable to stand on her own. Based on her behavior and body language, it was plain that her presence during the victim's shooting and the discovery of his body was a sufficiently startling event. See Commonwealth v. Irene, 462 Mass. 600, 607, cert. denied, 568 U.S. 968 (2012) ("We have viewed the circumstances of being shot, or witnessing a shooting, as sufficiently startling to impede normal reflective thought processes"). Additionally, just prior to Teixeira's

statements at police headquarters, she was so emotional that she became physically ill. Teixeira's emotional demeanor and physical illness shortly after the victim's murder and the discovery of his body are sufficient to demonstrate that Teixeira's statements were "a spontaneous reaction to the [victim's murder] and not the result of reflective thought." Mass. G. Evid. § 803(2). "Because both criteria of the spontaneous utterance exception were satisfied, the testimony was admissible." Irene, supra.

c. "Interpretive" testimony. The defendant challenges the admission of the testimony of Detective Brian Black, one of the lead investigators on the case, on the ground that it was improper interpretive testimony that went beyond the bounds of proper lay witness testimony. Because the defendant objected to Black's testimony, we review any error for prejudicial error. See Commonwealth v. Canty, 466 Mass. 535, 545 (2013).

Here, Black testified regarding the approximately four minute and thirty second time discrepancy between the bar's video surveillance footage and the defendant's GPS data. The judge allowed Black to review a compilation of the video surveillance footage side-by-side with the GPS data to help explain the investigative significance of the evidence when the time discrepancy is accounted for. Black testified that he had assisted in the creation of the compilation, discerned the

extent of the time discrepancy between the video surveillance footage and the defendant's GPS data, and had detailed familiarity with the evidence.  His testimony properly assisted the jury in evaluating the evidence and understanding the time discrepancy.  See Mass. G. Evid. § 701 & note (2017).  Moreover, the defendant was not prejudiced by Black's testimony regarding the time discrepancy because the defendant's own witness gave similar testimony, opining that the time discrepancy was approximately four minutes and thirty-five seconds.  The defendant's witness also attempted to resolve the time discrepancy by synchronizing the bar's surveillance footage and the defendant's GPS data.  There was no error.

5.  <u>Ineffective assistance of counsel</u>.  The defendant argues that trial counsel provided constitutionally ineffective assistance in failing to present evidence that would have countered the Commonwealth's theory of gang retaliation. Specifically, the defendant asserts that trial counsel should have "offered or directed the jury's attention to" (1) a Boston police memorandum detailing the December 24, 2011, altercation, which included a nonexhaustive list of active Wendover Street gang and Woodward Avenue gang associates, and which failed to list the victim as a Wendover Street gang associate; (2) the voir dire testimony of the victim's sister that he was an "associate," not a member, of the Wendover Street gang; and (3)

the defendant's GPS data and cellular telephone evidence that would counter the Commonwealth's theory that the defendant had been stalking or searching for the victim.

"Where, as here, the defendant has been convicted of murder in the first degree, we review his claim of ineffective assistance of counsel to determine whether the alleged lapse created a 'substantial likelihood of a miscarriage of justice,' a standard more favorable to the defendant than the constitutional standard otherwise applied under Commonwealth v. Saferian, 366 Mass. 89, 96 (1974)." Commonwealth v. Fulgiam, 477 Mass. 20, 29 (2017), quoting Wright, 411 Mass. at 681-682. "We focus more broadly on whether there was error and, if so, whether any such error 'was likely to have influenced the jury's conclusion.'" Fulgiam, supra, quoting Wright, supra. "The burden is on the defendant to demonstrate that something inappropriate was likely to have unfairly influenced the jury's verdict." Commonwealth v. Painten, 429 Mass. 536, 550 (1999).

Here, the defendant argues that counsel's failure to direct the jury's attention to the aforementioned pieces of evidence or seek their admission likely influenced the jury's verdict. We disagree. The defendant failed to establish how admission of the police memorandum and the testimony of the victim's sister that the victim was not a full-fledged member of the Wendover Street gang would have countered the Commonwealth's theory of

gang retaliation.  See id.  The Commonwealth provided evidence that the victim was an "associate" of the Wendover Street gang and that he had a friendship with a leader of that gang, who was involved in the December 24, 2011, altercation with the defendant, Lopes, and Montrond.  Similarly, evidence that the defendant traveled in the same area prior to seeing the victim at the bar does not counter the reasonable inference that after the defendant left the bar, having seen the victim, the defendant was searching the area for the victim as part of a joint venture to commit premeditated murder.  See id.  The defendant's assertion that trial counsel was ineffective is unavailing.

6.  Motion to dismiss indictments.  The defendant argues that the motion judge erred in denying his motion to dismiss indictments, pursuant to Commonwealth v. McCarthy, 385 Mass. 160, 161-163 (1982), because the Commonwealth failed to establish probable cause to believe that the defendant committed the victim's murder.  This argument has no merit.

"Probable cause to sustain an indictment is a decidedly low standard."  Commonwealth v. Hanright, 466 Mass. 303, 311 (2013).  "[A]t the very least the grand jury must hear sufficient evidence to establish the identity of the accused, . . . and probable cause to arrest him" (citation omitted).  McCarthy, 385 Mass. at 163.  "Probable cause has been defined as 'reasonably

trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.'" Hanright, supra at 311-312, quoting Commonwealth v. Stevens, 362 Mass. 20, 26 (1972). "Where, as here, the liability of a joint venturer is at issue, the Commonwealth must present the grand jury with evidence that the defendant both participated in, and shared the requisite mental state for, each crime charged." Hanright, supra at 312. When reviewing the sufficiency of an indictment, the grand jury evidence must be viewed in the light most favorable to the Commonwealth. See Commonwealth v. Moran, 453 Mass 880, 885 (2009).

Here, the Commonwealth presented to the grand jury sufficient evidence to sustain an indictment for the murder in the first degree of the victim as part of a joint venture. The evidence established that the defendant, Lopes, and Montrond were at the bar on the night of the murder. Video surveillance footage from the bar established that the SUV driven by the defendant and the Cadillac driven by Montrond were circling the area of the bar that night. Thirty minutes before the shooting, the defendant searched the bar. Prior to the shooting, the defendant told the victim he should not be in the area before speeding off, which made some of the victim's friends concerned. Despite Rosa's suggestion otherwise, the victim decided to go

into the bar and have a drink. The victim changed his mind after smoking a cigarette outside the bar and decided to leave. The victim told Teixeira about the defendant's threat as they were walking toward the victim's vehicle and confirmed that the defendant was the person who made the threat. Teixeira saw a man with braids, who she identified as the defendant, walking toward the vehicle and heard the victim say something like, "You gonna do me like this, J?" before the victim was shot. Finally, the defendant's GPS data placed him within fifteen feet of the victim at or about the time of the shooting. Based on the evidence presented to the grand jury, viewed in the light most favorable to the Commonwealth, there was probable cause to believe that the defendant knowingly participated and shared in the intent to commit the premeditated murder of the victim. See Hanright, 466 Mass. at 312.

7. Review pursuant to G. L. c. 278, § 33E. After a full review of the trial record, we affirm the conviction and decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Judgment affirmed.