NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1251

COMMONWEALTH

vs.

ALEXIS SILVA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial, the defendant was convicted of murder in the second degree (count 1), carrying a firearm without a license (count 2), carrying a loaded firearm without a license (count 3), and assault and battery by discharge of a firearm (count 4).  On appeal, the defendant first argues that law enforcement witnesses gave improper lay opinion testimony identifying him from surveillance video footage, as did the prosecutor in his opening, and usurped the fact-finding role of the jury.  Second, the defendant argues that the Commonwealth improperly questioned a witness on her invocation of her privilege against self-incrimination under the Fifth Amendment to the United States Constitution, which prejudiced the

defendant.  Third, he argues that the firearms convictions must be vacated in light of Commonwealth v. Guardado, 491 Mass. 666, 693 (2023) (Guardado I), and Commonwealth v. Guardado, 493 Mass. 1, 4-12 (2023) (Guardado II).  We vacate the convictions of counts 2 and 3, and affirm the remaining convictions.

Background.  The jury could have found the following facts, reserving certain facts for later discussion.  In the early morning hours of November 11, 2018, the defendant, his girlfriend (the girlfriend), and her friend (the friend) drove toward the girlfriend's home after a night of going to bars and drinking.  The defendant drove his white Lexus, and the friend drove the girlfriend in the friend's grey-colored Lexus.  The defendant had no passengers.  The cars made one brief stop along the way, at a gasoline station, but the defendant did not take on any passengers.

Near the girlfriend's home, the defendant and the friend stopped side-by-side on a residential street and discussed whether to go to a casino.  As they talked, two cars pulled up behind them -- one driven by the victim.  The victim "beeped" his horn, and the friend and the defendant pulled out of the way to let the cars pass.  The victim sped by, which angered the defendant.

The victim parked outside his house farther up the street and remained in his car.  The defendant drove past the victim's

parked car, turned around, and passed the victim's car again. The defendant pulled alongside the friend's car, and after a brief conversation, the friend drove away.  The defendant again drove alongside the victim, who was then getting laundry out of the back seat, and stopped.  Without getting out of his car, the defendant shot the victim twice and drove away.  The gunshot wounds proved fatal.

Investigators canvassed the surrounding area for surveillance video footage and obtained video recordings that captured the shooting and the subsequent flight of the shooter's light-colored sedan.  After viewing the video recordings, investigators determined that the shooter's vehicle was a white Lexus and identified the license plate number.  A Registry of Motor Vehicles search of the car's registration revealed that the white Lexus was registered to the defendant.

On the morning after the shooting, a State police trooper in an unmarked car set up surveillance on a house (subsequently determined to be the defendant's home) and found the white Lexus parked outside the house.[1]  The trooper saw a black sports utility vehicle (SUV), driven by a woman and carrying a male passenger, arrive outside the house.  The car drove away, but moments later, the trooper saw the male passenger walk toward

---

[1] This was the same house that the shooter's light-colored sedan drove to immediately after the shooting.

him and into the house.  The man re-emerged from the house having changed his clothes.  He opened the front passenger's side door of the white Lexus and began searching through the car as if looking for something.  The trooper recorded a brief video recording of the man, which was later admitted in to evidence at trial.  Police subsequently obtained a search warrant for the white Lexus and found gunshot residue on the interior of the car.

At trial, the trooper identified the defendant as the man he saw while conducting surveillance.  He subsequently identified the defendant in surveillance video recordings recorded during his surveillance.

Discussion.  1.  Identification from surveillance footage. First, the defendant argues that it was improper for the trooper and the prosecutor to identify the defendant from surveillance footage recorded after the shooting.  Further, the defendant argues that it was improper for two law enforcement witnesses to "narrate" a compilation video.

a.  Identification by the trooper.  As a threshold matter, the parties disagree on which standard of review applies. Before trial, the judge granted the defendant's motion in limine, which sought to "exclude opinion testimony by detectives as to what is presented on video surveillance evidence."  The judge allowed the motion, endorsing in the margin that

4

"[o]pinion evidence about contents of video may not be offered." The Commonwealth argues that the trooper's testimony was not opinion testimony and was not embraced by the judge's ruling on the motion in limine.  This would mean that the defendant's failure to object to the testimony at trial renders the error unpreserved and would require us to review for a substantial risk of a miscarriage of justice.  See Commonwealth v. Desiderio, 491 Mass. 809, 815 (2023).  The defendant contends, however, that the trooper gave lay opinion testimony, that it violated the judge's ruling on the motion in limine, and that the motion in limine preserved the error for appeal.  See Commonwealth v. Grady, 474 Mass. 715, 719 (2016).  Because we conclude infra that there was no error, we need not address whether the defendant's failure to object to the claimed violations of the judge's ruling in his favor at the time of the testimony means the claimed errors are unpreserved.  This issue was not addressed in Grady, supra.

"Making a determination of the identity of a person from a photograph or video image is an expression of an opinion." Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019), quoting Commonwealth v. Pina, 481 Mass. 413, 429 (2019).  Lay opinion testimony identifying a witness in a photograph or video recording is only admissible when the witness possesses "sufficiently relevant familiarity with the defendant that the

5

jury cannot also possess." Wardsworth, supra, citing Commonwealth v. Vacher, 469 Mass. 425, 441 (2014). In the absence of "sufficiently relevant familiarity," the jury must be able to draw their own conclusions regarding the identity of a person shown on video footage, and lay opinion testimony may not be offered. Id.

The trooper's testimony would be lay opinion testimony per Wardsworth if the trooper made his identification from a video recording. See Wardsworth, 482 Mass. at 474-475 (improper lay opinion of police officers who watched surveillance video recording depicting two persons and identified one of them as defendant based on clothing and physical features where police officers were not percipient witnesses to events captured on video recording). But the trooper personally saw the defendant outside the defendant's house. After viewing a surveillance photograph, the trooper testified, "That's the individual that I observed" both in a vehicle and on foot near the house. The trooper then identified the defendant in the court room as the man he personally saw during his surveillance.

Subsequently, the trooper did identify the defendant in surveillance images, including a video recording that the trooper took during his surveillance, but these identifications likewise derived from his personal observations. That the trooper's unmarked surveillance vehicle is visible in one of the

6

video recordings underscores that the trooper personally saw the events captured on surveillance video footage and photographs. Since the trooper did not testify as to the identity of a person "from a photograph or video image," he did not give opinion testimony in violation of the order on the motion in limine (emphasis added; citation omitted). Wardsworth, 482 Mass. at 475. There was no error.

The line of cases that the defendant cites, which stands for the rule that a witness must possess "sufficiently relevant familiarity" with the defendant to identify the defendant from a photograph or video recording, does not support his claims of error. See Wardsworth, 482 Mass. at 475; Pina, 481 Mass. at 429; Commonwealth v. Vacher, 469 Mass. 425, 441-442 (2014); Commonwealth v. Austin, 421 Mass. 357, 366 (1995); Commonwealth v. Vitello, 376 Mass. 426, 460 (1978); Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326-327 (1999); Commonwealth v. Anderson, 19 Mass. App. Ct. 968, 969 (1985); United States v. Vazquez-Rivera, 665 F.3d 351, 361 (1st Cir. 2011); United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011); United States v. Jadlowe, 628 F.3d 1, 24 (1st Cir. 2010); United States v. Garcia-Ortiz, 528 F.3d 74, 80 (1st Cir. 2008). These cases involve fact patterns where a law enforcement officer did not personally witness the events captured on video footage yet assisted the jury in identifying the defendant due to preexisting familiarity with the defendant.

7

See Wardsworth, 482 Mass. at 474-476 (testimony from officers, including those who stopped defendant, that defendant resembled person shown on surveillance video recording was improper where officers did not personally perceive events captured on video surveillance and lacked sufficient familiarity); Commonwealth v. Vacher, 469 Mass. 425, 441-442 (2014) (error to admit lay opinion testimony from non-eyewitness detective who lacked special familiarity); Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326-328 (2000) (officer with "sufficiently relevant familiarity" could identify defendant even though he was not eyewitness to events captured on videotape); Commonwealth v. Anderson, 19 Mass. App. Ct. 968, 969 (1985) (error to admit non-eyewitness identification of defendant as no "necessary conditions" justified admission).

Here, the trooper personally saw the defendant contemporaneously with the surveillance footage. He was permitted to testify to his observations; to the extent his testimony about surveillance images was lay opinion testimony, he had sufficient personal familiarity with the defendant's appearance to do so.[2] We discern no error.

---

[2] The defendant does not seek relief under Commonwealth v. Crayton, 470 Mass. 228, 241-244 (2014), or Commonwealth v. Collins, 470 Mass. 255, 260-266 (2014), as the trooper was not an eyewitness to the shooting itself.

8

b.  The prosecutor's remarks in opening.  The defendant assigns error to the prosecutor's opening statement: specifically that he told the jury that "you're going to see that approximately five minutes after the shooting . . . this defendant comes driving in, alone, still being the only person in that car, pull[s] up to [his house], get[s] out of that, [and] hustle[s] inside," and then played the corresponding video clip for the jury without commentary.  The defendant contends that the prosecutor impermissibly identified the defendant in the video recording, and that by "fronting" the video recording with the impermissible identification, the prosecutor "risked creating a cognitive bias," Wardsworth, 482 Mass. at 477.

We review this issue for a substantial risk of a miscarriage of justice, since there was no objection at trial. As above, we discern no error.  "The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence."  Commonwealth v. Kapaia, 490 Mass. 787, 794 (2022), quoting Commonwealth v. Fazio, 375 Mass. 451, 454 (1978).  Here, that occurred.  The evidence at trial supported the prosecutor's opening statement.  The friend testified that the defendant was alone in the white Lexus and drove on the victim's street, the location of the shooting, immediately before the shooting. Surveillance video footage captured the shooting, which also

9

showed the white Lexus's license plate.  The trooper's identification of the defendant further strengthened the Commonwealth's evidence of identification.  The prosecutor's comments fairly represented what he "expect[ed] the evidence to prove."  Commonwealth v. Simpson, 434 Mass. 570, 584 (2001).

The defendant counters this by arguing that no trial witness identified the defendant from the video recording that the prosecutor played in opening.  The video recording showed a white Lexus arriving at the defendant's home less than five minutes after the fatal shooting.  The driver got out of the car and ran inside the house.  At trial, the friend testified that the defendant was alone in the white Lexus moments before the shooting, when the defendant pulled alongside the friend's car and they briefly spoke.  As the prosecutor argued in closing, the jury could infer that, because the defendant was alone in the car at the time of the shooting, and his drive home was rapid and brief (and partially captured on composite surveillance video footage), it was impossible for him to have "let out a phantom passenger" en route.  The circumstantial evidence presented at trial supported the prosecutor's framing of the video recording during his opening statement.

Although the prosecutor arguably "primed" the jury to identify the defendant in the video recording, or implicitly asked them to infer that the video recording showed the

10

defendant, we do not discern a substantial risk of a miscarriage of justice.  See Wardsworth, 482 Mass. at 477 (witness primed jury to identify defendant in videotape by testifying before videotape played that "figure" they were about to see on videotape resembled defendant).  In Wardsworth, the Supreme Judicial Court concluded that the prejudicial effect of "priming" testimony outweighed its probative value.  Wardsworth, supra.  Here, in contrast, the prosecutor identified the defendant in a video recording during his opening statement, not during witness testimony.  The judge also instructed the jury that opening statements are not evidence.  "Any possible prejudice was cured by the judge's instruction that opening statements are not evidence."  Commonwealth v. Deloney, 59 Mass. App. Ct. 47, 51 (2003), citing Commonwealth v. Simpson, 434 Mass. 570, 584 (2001).  Further, as explained above, the Commonwealth's strong evidence of identification further mitigated any risk of a miscarriage of justice.

c.  Interpretive testimony.  The defendant also argues that two law enforcement witnesses improperly "narrated" a compilation video recording showing the defendant's car driving away from the crime scene.  The defendant alleges that it was error to allow the law enforcement witnesses to "narrate" what was happening on the video recording, rather than letting the jury draw its own conclusions.  Since the defendant did not

11

object at trial, we review for a substantial risk of a miscarriage of justice. Commonwealth v. Brum, 492 Mass. 581, 587 (2023).

Law enforcement witnesses may provide "interpretive testimony" when the testimony is helpful to the jury in evaluating the evidence and understanding the time sequence of composite video recordings. Commonwealth v. Barbosa, 477 Mass. 658, 673 (2017). For example, in Barbosa, an investigator played a compilation of video footage side-by-side by global positioning system (GPS) data to explain to the jury the significance of a time discrepancy between the two. Id. This testimony was properly admitted because it assisted the jury in understanding and evaluating the evidence. Id. at 673-674.

Here, the law enforcement witnesses gave interpretive testimony consistent with Barbosa. One witness collected the surveillance video recordings and testified to the sequence in which he gathered them. The other witness explained the time sequence between the video recordings. As in Barbosa, their interpretive testimony "properly assisted the jury in evaluating the evidence." Barbosa, 477 Mass. at 673.

The defendant's reliance on Wardsworth, 482 Mass. at 475-477, to the contrary is mistaken. Wardsworth did not involve interpretive testimony or testimony regarding video recording compilations. Rather, the issue in Wardsworth involved police

12

officers giving lay opinion testimony concerning the identity of persons captured on surveillance video footage, who the officers did not personally surveil.  See Wardsworth, supra at 474-475.  Here, the two law enforcement witnesses did not identify the defendant from the video footage.  There was no error.

2.  The prosecutor's questioning regarding the Fifth Amendment.  At trial, the Commonwealth called the girlfriend as a witness.  Prior to taking the stand, the girlfriend consulted with a court-appointed attorney, who told the judge that the girlfriend was refusing to testify by asserting her Fifth Amendment privilege against self-incrimination.  The Commonwealth petitioned for a grant of immunity, which the judge allowed.  The girlfriend subsequently testified that due either to intoxication or the passage of time, she could not remember anything related to the shooting.  Seeking to impeach the girlfriend's credibility, the prosecutor questioned her as follows:

Q:  "Now, ma'am, you came in this morning, you recall as a witness, true?"

A:  "I was."

Q:  "And you indicated -- you had indicated that you were not going to testify by asserting, which is your right and privilege."

A:  "Uh-huh.  Uh-huh."

Q:  "Your Fifth Amendment."

13

Defense counsel:  "Objection."

The judge:  "Overruled.  You can -- you can inquire."

Q:  "Isn't that right?"

A:  "Yes."

Q:  "Okay.  And you have the right under the Fifth Amendment or federal constitution also, under Article 12 of our state constitution to assert that.  You understand that?"

A:  "I don't honestly understand any of it."

Q:  "Okay. . . .  But you asserted your privilege."

A:  "I did."

Q:  "Is that right?"

A:  "Yeah."

Q:  "Which means we could not force you to testify, true?"

A:  "I guess."

Q:  "And so we actually had to give you a grant of immunity."

Defense counsel:  "Objection. . . ."

The judge:  "It is overruled. . . ."

Q:  "You understand you're testifying now under a grant of immunity, true?"

A:  "I guess."

Although the prosecutor questioned the girlfriend's credibility in his closing statement, he did not refer to her invocation of the Fifth Amendment.

14

At the outset, we note briefly that the prosecutor's inquiry into the grant of immunity was proper and we discern no error therein. See Commonwealth v. Troche, 493 Mass. 34, 52 (2023) ("A witness who has received immunity may be questioned about the immunity for impeachment purposes"). As for the inquiry into the witness's invocation of her Fifth Amendment privilege against self-incrimination, the Commonwealth concedes that it was improper for the prosecutor to develop this line of impeachment. See id. at 51-52 (improper for prosecutor to elicit testimony regarding witness's earlier invocation of Fifth Amendment to impeach witness's credibility). The Commonwealth maintains, however, that the error was not prejudicial and does not require reversal. See Commonwealth v. Fisher, 433 Mass. 340, 350 (2001) ("reversal is not required in every case where the jury hear a witness assert some privilege or refuse to testify"). Because the defendant objected at trial, we review for prejudicial error. Commonwealth v. Tavares, 482 Mass. 694, 712 (2019).

"[W]hen a witness refuses to answer questions in front of the jury, '[t]he inquiry is (1) whether the prosecutor has so unfairly exploited the matter as to constitute prosecutorial misconduct, and (2) whether inferences from the witness's refusal to answer may have added critical weight to the prosecution's case.'" Fisher, 433 Mass. at 350, quoting

15

Commonwealth v. Kane, 388 Mass. 128, 138 (1983).  See Namet v. United States, 373 U.S. 179, 186-189 (1963).

A prosecutor "unfairly exploit[s]" an invocation of a privilege when the prosecutor "question[s] a material witness in order to provoke a claim of privilege with a deliberate design to raise improper inferences in the minds of the jury."  Fisher, 433 Mass. at 350.  Although "the jury is not entitled to draw any inferences from the decision of a witness to exercise [her] constitutional privilege," Commonwealth v. Hesketh, 386 Mass. 153, 157 (1982), citing Bowles v. United States, 439 F.2d 536, 541 (D.C. Cir. 1970), the jury may draw other inferences from the remainder of the witness's testimony.

Here the prosecutor did not unfairly exploit the girlfriend's invocation of the Fifth Amendment such that he committed prosecutorial misconduct.  What was damaging to the defense was not hearing that the girlfriend invoked the privilege, but rather the inferences that the jury could have fairly drawn from her testimony.  The girlfriend's testimony was evasive and inconsistent.  The jury could have reasonably inferred that the girlfriend was feigning memory loss and testifying inconsistently to protect the defendant.  See Commonwealth v. Almeida, 452 Mass. 601, 608 (2008) ("[The witness's] memory lapses were additional fodder for impeaching her credibility, and defense counsel so used them in his closing

16

argument"); Commonwealth v. Frank, 433 Mass. 185, 193-194 (2001) ("We do not consider the prosecutor's cross-examination of the defendant as to his loss of memory on the night of the murder, and what was said about that evidence by the prosecutor in his closing, as inappropriate or unfair"). This was the inference that the prosecutor tried to elicit, not any improper, and sole, inference regarding the Fifth Amendment.

Secondly, the questions regarding the invocation of the Fifth Amendment did not add critical weight to the Commonwealth's case. The prosecutor asked the girlfriend very few questions that referred to the Fifth Amendment and he did not address her invocation of the privilege in his closing argument. See Kane, 388 Mass. at 138 (no reversal where prosecutor asked only one question that witness refused to answer, prosecutor did not return to issue in his closing argument, and prosecution did not "consciously [seek] to build its case out of the inferences arising from [the witness's] silence"). When he did refer to the girlfriend's testimony in closing, the prosecutor "remain[ed] within the bounds of the evidence and the fair inferences from the evidence." Commonwealth v. Pettie, 363 Mass. 836, 840 (1973). First, he argued that the girlfriend had identified the defendant "reluctantly" from a photograph from surveillance video footage outside the last bar they visited. Second, he argued that the

17

girlfriend claimed to be drunk on the night of the shooting and could not remember anything.  We cannot conclude that the improper questions added critical weight to the Commonwealth's case, where the prosecutor asked minimal questions about the Fifth Amendment privilege and did not press the issue in closing argument.

The cases cited by the defendant to the contrary are unavailing.  This case is unlike Richardson v. State, 246 So. 2d 771, 777 (Fla. 1971), in which the prosecution called an alleged accomplice who it knew would invoke his Fifth Amendment privilege against self-incrimination to draw an inference that "not only was [the accomplice] guilty, but also the [defendant]."  This case also does not resemble United States v. Tomaiolo, 249 F.2d 683, 690-695 (2nd Cir. 1957), which involved the cumulative effect of improper cross-examination by the defendant's brother regarding prior invocation of the Fifth Amendment privilege before the grand jury along with other errors resulting in a fundamentally unfair trial.  Nor does it resemble Grunewald v. United States, 353 U.S. 391, 415-424 (1957), where it was improper for the prosecutor to elicit on cross-examination that a defendant invoked his privilege against self-incrimination before grand jury to similar questions he testified to at trial, primarily because invocation was not inconsistent with the defendant's trial testimony claiming

18

innocence.  Where, as here, the prosecutor did not unfairly exploit the matter, and it did not add critical weight to the prosecution's case, see Fisher, 433 Mass. at 350, we cannot conclude that the defendant's trial was unfair in this regard, let alone fundamentally unfair.

3.  The defendant's firearms convictions.  The parties agree that the defendant's convictions of carrying a firearm without a license (count 2) and carrying a loaded firearm without a license (count 3) must be vacated under Guardado I, 491 Mass. at 668.  In Guardado I, the Supreme Judicial Court held that "[b]ecause possession of a firearm in public is constitutionally protected conduct [see New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 8-12 (2022)], in order to convict a defendant of unlawful possession of a firearm, due process requires the Commonwealth prove beyond a reasonable doubt that a defendant did not have a valid firearms license." Guardado I, supra at 668.  This holding applies "to those cases that were active or pending on direct review as of the date of the issuance of [Bruen]."  Guardado I, supra at 693.  Bruen was decided on June 23, 2022.  Bruen, supra at 1.  In this case, jury empanelment began on July 11, 2022, and the trial began on July 13, 2022.  Because this case was "active . . . as of the date of the issuance of [Bruen]," Guardado I, supra, and the Commonwealth did not introduce evidence of the defendant's lack

19

of licensure under then-prevailing law, we vacate the judgments on counts 2 and 3.

In the briefing, and at oral argument, the parties disagree on whether the defendant may be retried on these counts. However, this precise question was decided by the Supreme Judicial Court in Commonwealth v. Crowder, 495 Mass. 552, 559 (2025), which was pending at the time of briefing and oral argument. In Crowder, id., the Supreme Judicial Court concluded that "a new trial is the proper remedy for defendants who were convicted under G. L. c. 269, § 10 (a), after the Supreme Court decided Bruen but before [the Supreme Judicial Court] decided Guardado I," as here. Thus, the Commonwealth may retry the defendant on counts 2 and 3 if it so chooses.

Conclusion. The judgments on counts 1 and 4 are affirmed. The judgments on counts 2 and 3 are vacated, and the verdicts are set aside.

> So ordered.
>
> By the Court (Henry, Sacks & Singh, JJ.[3]),
>
> Clerk

Entered: July 8, 2025.

---

[3] The panelists are listed in order of seniority.